Argued and submitted July 9, judgment of conviction for aggravated murder affirmed; sentence of death vacated, and case remanded to the circuit court for further proceedings October 25, 1990

# STATE OF OREGON,
*Respondent,*

*v.*

# RICKY LEON DOUGLAS,
*Appellant.*

## (CC J88-0944; SC S36035)

800 P2d 288

Diane L. Alessi, Deputy Public Defender, Salem, argued the cause for appellant. On the brief were Sally L. Avera, Public Defender, and John P. Daugirda, Deputy Public Defender, Salem.

Brenda J Peterson, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

GRABER, J.

Fadeley, J., specially concurred by opinion.

**GRABER, J.**

A jury convicted defendant of aggravated murder by solicitation, ORS 163.095(1)(b),[1] and he received a sentence of death. The case is before us on automatic and direct review. ORS 163.150(1)(f) (1987). We affirm the conviction of aggravated murder, vacate the sentence of death, and remand the case for a new penalty phase proceeding.

We state the facts in the light most favorable to the state. *State v. Brown,* 310 Or 347, 350, 800 P2d 259 (1990). In March 1987, Rene Wright separated from her boyfriend, Chuck Pease, and moved in with defendant. On March 18, Wright and defendant drove to Reno and were married. Shortly thereafter, Wright left defendant and returned to Pease.

Defendant was angry that Wright had left him. He threatened her and demanded that she return to him. He then focused his anger on Pease. Defendant, a methamphetamine dealer, told friends that he thought that Pease was a drug enforcement agent, who had blackmailed Wright into leaving him. He also told friends that he was going to have Pease killed. Al Henderson testified that defendant had hired him to kill Pease for $5,000, but that Henderson had abandoned the contract.

In July 1987, an acquaintance of defendant's, Zane Justesen, arranged a meeting between defendant and Dave Marr to discuss a contract to kill Pease. Ladd Justesen, Zane's brother and a friend of Marr, testified that Marr offered him $4,000 to help find Pease.

On September 16, 1987, Marr and Ladd Justesen drove to Pease's home in Myrtle Creek. Pease was not there, so they drove to a nearby grocery store. By unfortunate coincidence, Pease and Wright were at the store. Justesen told Pease that Justesen's pickup had broken down. He offered

---

[1] ORS 163.095 provides:

" '[A]ggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(1)(b) The defendant solicited another to commit the murder and paid or agreed to pay the person money or other thing of value for committing the murder."

Pease $10 to give him a ride to the pickup. Pease agreed, but said that he first had to take Wright home. While Pease drove Wright home, Marr drove the pickup to a quiet spot on Highway 42.

Pease returned to the grocery store and drove Justesen to the pickup. Marr approached and asked Pease if he would help retrieve some bags of marijuana from the bushes at the side of the road. Pease agreed. As the men walked down the embankment, Marr moved behind Pease, reached around him, and cut his throat. A police officer discovered Pease's body the next day.

Defendant made a series of admissions during the following months. For example, he told his uncle that he had paid Marr $10,000 to kill Pease.

On appeal, defendant raises eight assignments of error, the first two of which relate to the guilt phase of the trial. In his first assignment of error, defendant challenges the trial court's denial of his motion to excuse juror Oswald for cause. He points to several statements that Oswald made during *voir dire,* which, he asserts, demonstrated that she could not be fair to him.

■ Defendant used a peremptory challenge to remove Oswald from the panel. Although he exhausted his peremptory challenges, he did not object to any of the jurors who ultimately heard the case. In that circumstance, we need not decide whether the challenge for cause should have been allowed. This court held, in *State v. Megorden,* 49 Or 259, 263-64, 88 P 306 (1907), that:

> "The erroneous overruling of a good challenge for cause, thereby compelling the use of a peremptory challenge, is not prejudicial error where it does not appear that the challenger was compelled to accept an objectionable juror."

*State v. Rathie,* 101 Or 339, 348-49, 199 P 169, 200 P 790 (1921), reached the same result, although this court characterized the defendant's failure to object to any of the remaining jurors as a "waiver." We think that *State v. Megorden, supra,* more accurately described the reason for the rule, which is a lack of demonstrated prejudice:

> " 'The simple question, after the peremptory challenges are

exhausted is: "Is the jury which finally tries the case impartial?" If so, we cannot imagine that the accused has any just ground of complaint with regard to it. All that the constitution, all that the law, requires and demands is a trial "by an impartial jury." If he makes no complaint or has no complaint to make of it as finally organized, the presumption is legitimate that it is impartial.' " 49 Or at 264 (quoting *Loggins v. The State,* 12 Tex App 65, 85 (1882)).

In *State v. Farrar,* 309 Or 132, 786 P2d 161 (1990), this court held that the defendant, who had challenged the trial court's denial of his motion to dismiss a juror for cause, was not entitled to relief. Although the court noted that the defendant in *Farrar* had unused peremptory challenges remaining, its other reasoning applies here with equal force:

"Defendant acknowledges that he removed the juror thereafter from the jury panel through his use of a peremptory challenge. Consequently, the juror did not actually sit on the jury that was empaneled for trial. * * * Defendant did not and does not argue that any member of the jury panel that actually decided his guilt should have been excused for cause. Moreover, he did not [and] does not * * * contend that his use of a peremptory challenge to excuse the juror forced him to accept a jury that he otherwise would not have accepted. Defendant fails to identify any prejudice that may have resulted from the ruling even if it were error." 309 Or at 158.

Defendant has not even argued, let alone demonstrated, that the final jury panel was inappropriate in any way. He has, therefore, failed to show that the trial court's decision to deny the motion to dismiss juror Oswald for cause was reversible error.

In his second assignment of error, defendant argues that the trial court improperly admitted, under OEC 804(3)(a),[2] former testimony given by Carol and Bob Cooper. The Coopers had testified against defendant at his security release hearing. When the time for trial arrived, however, Bob

---

[2] OEC 804(3)(a) provides:

"The following are not excluded by [OEC 802, the hearsay rule,] if the declarant is unavailable as a witness:

"(a) Testimony given as a witness at another hearing of the same or a different proceeding, * * * if the party against whom the testimony is now offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

Cooper, who was facing prosecution on racketeering charges, invoked his constitutional privilege against self-incrimination. Carol Cooper also invoked the privilege, but only as to questions about controlled substances.

The trial court ruled that the Coopers were "unavailable" within the meaning of OEC 804(1)(a)[3] and that defendant had had "an opportunity and similar motive to develop [their] testimony," as required by OEC 804(3)(a), at the security release hearing. "The court determines under Rule 104(1) whether the requirements of unavailability have been satisfied." Kirkpatrick, Oregon Evidence 618, § 804 (2d ed 1989).

"[OEC 104(1)] assigns to the trial judge the responsibility for making certain preliminary determinations regarding * * * admissibility. * * * Is a witness whose former testimony is offered unavailable? * * *

"To the extent that these preliminary inquiries are factual, the judge will necessarily receive evidence and act as a trier of fact. * * * Preliminary questions may also call for an evaluation of evidence in terms of a legal standard. * * * The judge is to make these decisions as well." Id. at 28.

We are bound by the trial court's findings of historical fact, but not by its legal conclusions. See State v. Herbert, 302 Or 237, 241, 729 P2d 547 (1986) (rule applied to determination of probable cause). We consider defendant's arguments with those standards in mind.

■ Defendant first challenges the trial court's holding that Carol Cooper was "unavailable." Although he concedes that Bob Cooper's invocation of his privilege as to all questions made him unavailable, defendant contends that Carol Cooper's "partial" invocation of her privilege did not make her similarly unavailable. On this record, the trial court properly disagreed.

Carol Cooper declined to answer any questions about drugs. Defendant's counsel himself pointed out that he would be unable to cross-examine her effectively without asking her questions about drug use:

---

[3] A declarant is "unavailable" under OEC 804(1)(a) if the declarant:

"Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of a statement."

"DEFENSE COUNSEL: [Carol Cooper has] made numerous statements about the whole gamut of affairs between [*sic*] her, her husband and [defendant]. Adequate cross-examination of her would be extraordinarily different if for instance we couldn't talk about the fact that her husband is a meth cook and she knew about it and was aware of his association with various other witnesses.

"* * * * *

"* * * They [Carol Cooper and another witness] were both [methamphetamine] users or have been in the past. The circumstances under which they observe what they are here to report if they decide to testify would be a subject of cross-examination very properly * * *."

Moreover, the whole fabric of Carol Cooper's testimony was threaded with references to drugs. Her story would have lacked coherence if all references to drugs had been excised. Because she could not testify meaningfully without mentioning drugs, the trial court did not err in concluding that she was unavailable within the meaning of OEC 804(1)(a).

■ Defendant next asserts that the Coopers' testimony did not meet the requirements of OEC 804(3)(a) that there have been an "opportunity and similar motive to develop the testimony" in the former hearing. He is wrong. The security release hearing did meet those requirements.

First, defendant had the opportunity at the security release hearing to cross-examine the Coopers. Indeed, he availed himself of it fully. He was present and represented by counsel at the hearing. His counsel cross-examined both witnesses to try to discredit their direct testimony. For instance, counsel elicited from Carol Cooper that she was a drug user who had a prior drug-related conviction and other charges pending. He discredited Bob Cooper with several facts, including these: he had four prior convictions, he resented defendant, he decided to talk to the police only after being arrested on a drug charge, and he used methamphetamines during the period about which he was testifying.

Second, defendant had a similar motive to cross-examine the Coopers at the security release hearing. The parties and the pending charge were identical in the two proceedings. Like the trial, the security release hearing focused on the question of defendant's guilt. When a defendant is charged

with murder, release will be denied if the "proof is evident or the presumption strong that the person is guilty." ORS 135.240(2); Or Const, Art I, § 14. We presume that defendant sought the hearing because he wanted to be released. That is, not only was the central issue of guilt essentially the same, but also defendant's motive in having that issue decided in his favor at the security release hearing was similar to his motive at trial.

This court has held that a preliminary hearing provides an opportunity to cross-examine witnesses and suggests a motive to do so that is similar to the motive at trial. *State v. Moen,* 309 Or 45, 84-86, 786 P2d 111 (1990). Defendant seeks to distinguish a security release hearing from a preliminary hearing on two grounds: that the burden of proof is different and that dismissal of the charge is not an option after the security release hearing.

At a preliminary hearing, the state need only show probable cause to believe that a crime has been committed and that the defendant is the one who committed it. ORS 137.175. At a security release hearing, the state must prove by clear and convincing evidence that the defendant is guilty of murder. *Haynes v. Burks,* 290 Or 75, 79, 619 P2d 632 (1980). A preliminary hearing can result in dismissal of the charge, ORS 135.175; a security release hearing cannot, ORS 135.245. Neither of those differences, however, changes the fundamental point: In either circumstance, the defendant has both an opportunity to cross-examine the state's witnesses and a motive that is similar to the motive at trial.

Defendant also argues that admitting the Coopers' former testimony violated his right under the state and federal constitutions to confront witnesses against him.[4] Because he had an opportunity to cross-examine the Coopers at the security release hearing and a motive similar to the one at trial, the admission of their former testimony did not violate

---

[4] Or Const, Art I, § 11, provides in part:

"In all criminal prosecutions, the accused shall have the right to * * * meet the witnesses face to face * * *."

US Const, Amend VI, provides in part:

"In all criminal prosecutions, the accused shall enjoy the right to * * * be confronted with the witnesses against him * * *."

defendant's confrontation rights under the state or federal constitutions. *State v. Moen, supra,* 309 Or at 86.

Finally, defendant asserts that a portion of Bob Cooper's testimony was irrelevant[5] and unduly inflammatory.[6] The disputed testimony was that Cooper and defendant were partners in the methamphetamine manufacturing business and that defendant had made over $250,000 in a six-month period.

■ Assuming, without deciding, that the evidence was admitted erroneously, the error would not require us to reverse defendant's conviction. OEC 103(1).[7] There was extensive testimony, from virtually every witness, that defendant manufactured methamphetamines. Part of defendant's defense was that he owed Marr $10,000 for a methamphetamine recipe, rather than for a murder for hire. There also was evidence, apart from Cooper's testimony, that defendant had the means to pay Marr $10,000 to kill Pease. For instance, defendant's aunt testified without objection that she was keeping track of defendant's expenses and that he was spending about $500,000 per year. We are satisfied that there is little, if any, likelihood that admitting the disputed portion of Cooper's testimony affected the verdict. *State v. Miller,* 300 Or 203, 221, 709 P2d 225 (1985), *cert den* 475 US 1141 (1986). In addition, there was substantial and convincing evidence of defendant's guilt, including his admissions. 300 Or at 220. Therefore, the

---

[5] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

OEC 402 provides:

"All relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, by the Constitutions of the United States and Oregon, or by Oregon statutory and decisional law. Evidence which is not relevant is not admissible."

[6] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[7] OEC 103(1) provides in part:

"Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected * * *."

error, if any, was not prejudicial, and defendant's second assignment of error does not entitle him to relief.

The remaining assignments of error relate to the penalty phase of the trial, which was conducted pursuant to ORS 163.150 (1987). We will discuss only those arguments that have not been decided adversely to defendant's position in our previous cases.

■ Defendant contends that the trial court's instructions impermissibly limited the way in which the jury could consider mitigating evidence about him. As the state concedes, that argument is well taken in the light of *State v. Wagner,* 309 Or 5, 14-20, 786 P2d 93 (1990) (*Wagner II*), which was decided after the trial in this case. The jury instructions that the trial court gave did not meet the federal constitutional requirements identified in *Wagner II.* As a result, the penalty phase of defendant's trial was flawed. We therefore vacate defendant's death sentence and remand the case to the circuit court for a new penalty phase proceeding or, at the election of the district attorney, for entry of a life sentence. *Wagner II, supra,* 309 Or at 20; *State v. Farrar, supra,* 309 Or at 177-78.

Defendant next claims that the trial court erred in not granting a mistrial *sua sponte* when the prosecutor, during the closing argument in the penalty phase of the trial, told the jury that it could not consider mitigating evidence until after it had decided on "yes" answers to the sentencing questions. That issue is unlikely to arise on remand. Accordingly, we need not consider it.

Two of defendant's penalty phase assignments relate to instructions on life imprisonment. We recognize that we could decline to address those issues, because we are returning this case to the trial court for a new penalty phase proceeding. *State v. Brown, supra,* 310 Or at 374. We consider the issues nonetheless, because they have arisen repeatedly in other cases and because they may arise on remand in this case.[8]

■ The first of these challenges is to the trial court's refusal to instruct the jury that "life imprisonment means imprisonment for the rest of defendant's life." Defendant

---

[8] We need not and do not decide whether the former statute or the current statute, ORS 163.150 (1989), applies to the penalty proceeding on remand of this case.

relies on *State v. Leland,* 190 Or 598, 227 P2d 785 (1951), *aff'd sub nom Leland v. Oregon,* 343 US 790, 72 S Ct 1002, 96 L Ed 1302 (1952). This court recently rejected the notion that *Leland* requires such an instruction. *State v. Simonsen,* 310 Or 412, 798 P2d 241 (1990). As this court held in *Simonsen,* that requested instruction would not have been a correct statement of the law under ORS 163.150(2) (1987) and ORS 163.105 (1987). 310 Or at 417. For that reason, defendant's assertion that the failure to give the instruction "constituted reversible error under the Eighth and Fourteenth Amendments" is not well taken.

In addition, defendant urges that the trial court erred by giving this instruction about the provisions of the statutes that govern a sentence of life imprisonment:

"The defendant, in this case, has been found guilty of aggravated murder. Oregon law provides that the penalty for aggravated murder shall be either death or life imprisonment. If sentenced to life imprisonment the court shall order that the defendant shall be confined for a minimum of 30 years without possibility of parole, release on work release or any form of temporary leave or employment at a forest or work camp.

"At any time after 20 years from the date of imposition of a minimum period of confinement, the State Board of Parole, upon petition of the prisoner so confined, shall hold a hearing to determine if the prisoner is likely to be rehabilitated within a reasonable period of time. The sole issue shall be whether or not the prisoner is likely to be rehabilitated within a reasonable period of time.

"At such hearing the prisoner shall have the burden of proving by a preponderance of the evidence, which means the greater weight of the evidence, the likelihood of rehabilitation within a reasonable period of time and the prisoner shall have the right if the prisoner is without sufficient funds to employ an attorney, to be represented by legal counsel appointed by the board at board expense.

"If upon hearing all of the evidence, the board upon unanimous vote of all five members, finds that the prisoner is capable of rehabilitation and that the terms of the prisoner's confinement shall be changed to life imprisonment with a probability [*sic:* possibility] of parole or work release, it shall enter an order to that effect and the order shall convert the term of the prisoner's confinement to life imprisonment with

the possibility of parole or work release. Otherwise, the board shall deny the relief sought in the petition.

"Not less than two years after a denial of the relief sought in a petition, the prisoner may again petition for a change in terms of confinement. Further petitions for a change may be filed at intervals of not less than two years thereafter."

Defendant relies on *State v. Leland, supra,* to support this argument as well. During the *voir dire* in *Leland,* defense counsel asked a prospective juror whether he had any moral objections to imposing the death penalty. The juror responded that it would depend on whether, if a life sentence were imposed, the defendant would actually be incarcerated for life. The trial court told the juror that the parole board would determine how long the defendant would serve. On appeal, this court held that it was improper for the court to tell the jury about the possibility of parole. 190 Or at 623. The court explained that the possibility of parole was speculative and irrelevant to the jury's choice between capital punishment and life imprisonment, although a later instruction that the jury should assume that life imprisonment meant imprisonment for life cured the error. *Ibid.*

The state responds that *State v. Leland, supra,* is not controlling, because it was decided under an earlier statute. Unlike the statute that was in effect 40 years ago, the present one requires the jury to decide whether there is a probability that the defendant will commit future acts of criminal violence that would constitute a continuing threat to society. That is the second of the four questions that the jury must answer in the sentencing phase of a death penalty trial. *Wagner II, supra,* 309 Or at 8. According to the state, the challenged instruction is relevant to the jury's assessment of future dangerousness.[9]

The state's position rests on federal law. The United States Supreme Court addressed a similar issue in *California v. Ramos,* 463 US 992, 103 S Ct 3446, 77 L Ed 2d 1171 (1983). A California statute requires the trial judge to inform the jury that a sentence of "life imprisonment without possibility of parole" may be commuted by the Governor to a sentence that

---

[9] The instruction is not relevant to the jury's deliberations on the other three questions, and the state does not argue otherwise.

includes the possibility of parole. The Supreme Court held that the California statute is constitutional under the Eighth Amendment, as applied to the states by the Fourteenth Amendment. By bringing to the jury's attention the possibility that the defendant may be returned to society, the California instruction invites the jury to assess whether the defendant is someone whose future behavior makes a return to society undesirable. The instruction thus focuses the jury on future dangerousness, which is a constitutionally permissible consideration. 463 US at 1002-04.

■ *California v. Ramos, supra,* however, does not answer the question under Oregon law, which makes clear that the concept of "society" is broader than the one that the discus-˘ sion in *Ramos* suggests. This court has held that the threat to society means the threat to all of " 'society,' no matter whether the universe of that society be great or small." *State v. Wagner,* 305 Or 115, 153, 752 P2d 1136 (1988), *judgment vacated and remanded on other grounds sub nom Wagner v. Oregon,* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989). Society includes prison society, as well as society at large. When the jury considers the threat that the defendant might pose because of future violent crimes, it may consider the threat to prison society. *State v. Farrar, supra,* 309 Or at 175-76.

■ ■ In general, therefore, the task of the jury is to consider, not *where* the defendant would be dangerous, but *whether* the defendant would be dangerous. The evidence in a particular case could make an instruction on the possibility of release relevant to the jury's assessment of future dangerousness. For example, an expert might testify that the defendant would not pose a threat to prison society, because of its structured environment, but would pose a threat to society at large, if released. Unless the evidence permits the jury to draw a distinction between prison society and "outside" society, however, the jury may be distracted from its proper task, even by an instruction that correctly describes the law. *See Honeywell v. Sterling Furniture Co.,* 310 Or 206, 211, 797 P2d 1019 (1990) (reversible error to instruct jury on the way the law directed an award of punitive damages to be apportioned, when manner of apportionment was not one of the criteria on which jury was supposed to decide whether to award such damages). In the absence of evidence making it relevant, a

trial court should not give an instruction on the possible release of persons sentenced to life in prison in a proceeding under ORS 163.150 (1987).[10]

■ Next, defendant argues that the trial court erred in refusing to instruct the jury that the law presumes that he acted nondeliberately and reasonably and that he will be non-violent in the future. He relies on the presumption of an accused's innocence. ORS 136.415; ORS 10.095(6). This court has already rejected the claim that jurors should be told to presume that the defendant will be nonviolent in the future. *State v. Smith,* 310 Or 1, 30, 791 P2d 836 (1990); *State v. Montez,* 309 Or 564, 613, 786 P2d 1352 (1990); *State v. Farrar, supra,* 309 Or at 178. The same analysis applies to defendant's other requested instructions. The trial court instructed the jury that the state had the burden to prove, beyond a reasonable doubt, that the answer to each of the statutory questions was "yes." No more was required. *State v. Montez, supra,* 309 Or at 613.

■ Defendant's final argument is that the trial court erred in disallowing his demurrer, which raised a host of statutory and constitutional challenges to Oregon's death penalty scheme. All but one have been addressed and rejected by this court in earlier cases. The unanswered assertion is that ORS 163.095 violates the Oregon Constitution, because the phrase "thing of value" is vague.

ORS 163.095(1)(b) provides that a person commits aggravated murder when:

> "The defendant solicited another to commit the murder and paid or agreed to pay the person money or other thing of value for committing the murder."

The indictment charged that defendant agreed to pay and paid Marr "money or other thing of value" to murder Pease. "[I]f the indictment clearly and definitely states facts sufficient to constitute a crime, the mere fact that some of the allegations thereof are indefinite and uncertain does not render it vulnerable to a general demurrer." *State v. Du Bois,* 175 Or 341,

---

[10] We do not decide whether, or in what circumstances, such an instruction might be appropriate under the new statute, ORS 163.150 (1989), which provides the additional sentencing alternative of life imprisonment without the possibility of release or parole.

345, 153 P2d 521 (1944). The allegation that defendant agreed to pay and paid Marr "money" for the murder of Pease is not vague, and defendant does not argue that it is.[11] As this court held in *State v. Farrar, supra,* 309 Or at 183, "[d]efendant's abstract concern about how the statute might be applied to others is irrelevant to the validity of his own conviction."

Judgment of conviction for aggravated murder affirmed; sentence of death vacated; case remanded to the circuit court for further proceedings.

**FADELEY, J.,** specially concurring.

I concur in the result for the reasons stated in the specially concurring opinion in *State v. Simonsen,* 310 Or 412, 798 P2d 241 (1990), and for the additional reason that I cannot agree with footnote 8 of the lead opinion which implies that penalty-phase proceedings conducted under the pre-1989 "statute," are permissible even though that statute contained characteristics which the United States Supreme Court, in *Wagner v. Oregon,* 492 US 914, 109 S Ct 3235, 106 L Ed2d 583 (1989), found to justify vacation of a judgment based thereon. Note 8 of the lead opinion reads:

"We need not and do not decide whether the former statute or the current statute, ORS 163.150 (1989), applies to the penalty proceeding on remand of this case." 310 Or at 447, n 8.

However, as *Wagner v. Oregon* was being decided in Washington, D.C., the legislature changed the jury-sentencing statutes. Oregon Laws 1989, chapter 720, section 1 (amending ORS 163.105 to provide two forms of life sentence, one of which is "without the possibility of release or parole")[1] and

---

[11] Neither does defendant argue that the proof as to the payment of "money" was deficient.

[1] Oregon Laws 1989, chapter 720, section 1, in part provides:

"(1)(a) When a defendant is convicted of aggravated murder as defined by ORS 163.095, the defendant shall be sentenced, pursuant to ORS 163.150, to death, life imprisonment without the possibility of release or parole or life imprisonment.

"(b) A person sentenced to life imprisonment without the possibility of release or parole under this section shall not have that sentence suspended, deferred or commuted by any judicial officer, and the State Board of Parole may not parole the prisoner nor reduce the period of confinement in any manner whatsoever. The Department of Corrections or any executive official may not permit the prisoner to participate in any sort of release or furlough program.

"(c) If sentenced to life imprisonment, the court shall order that the defendant shall be confined for a minimum of 30 years without possibility of parole, release on work release or any form of temporary leave or employment at a forest or work camp."

section 2 (amending ORS 163.150 to empower the jury to alter that form of life sentence to a second form with a possibility of parole, if the parole board unanimously agrees at a hearing after the defendant has served 20 years)[2] are effective as of July 1989. Oregon Laws 1989, chapter 790, section 135b, further provides that its ORS 163.150 amendments: "are procedural and shall apply to any defendant sentenced to death after December 6, 1984."[3]

Chapter 790 was adopted after the effective date of chapter 720. Thus, on its face, the cross reference to ORS 163.105 contained in chapter 790, section 135b, applies to the 1989 form of that statute providing for both forms of life imprisonment.

Moreover, the tax cost and the delay in punishment,

---

[2] Oregon Laws 1989, chapter 720, section 2, in part provides:

"(1)(a) Upon a finding that the defendant is guilty of aggravated murder, the court, except as otherwise provided in subsection (3) of this section, shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment, as described in ORS 163.105 (1)(c), life imprisonment without the possibility of release or parole, as described in ORS 163.105 (1)(b), or death. The proceeding shall be conducted in the trial court before the trial jury as soon as practicable. If the defendant has pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose. * * *

"* * * * *

"(2)(a) Upon the conclusion of the presentation of the evidence, the court shall also instruct the jury that if it reaches a negative finding on any issue under paragraph (b) of subsection (1) of this section, the trial court shall sentence the defendant to life imprisonment without the possibility of release or parole, as described in ORS 163.105 (1)(b), unless 10 or more members of the jury further find that there are sufficient mitigating circumstances to warrant life imprisonment, in which case the trial court shall sentence the defendant to life imprisonment as described in ORS 163.105 (1)(c)."

[3] Oregon Laws 1989, chapter 790, section 135b, in part provides:

"(3) Notwithstanding paragraph (a) of subsection (1) of this section, the following shall apply:

"(a) * * * Upon remand and at the election of the state, the trial court shall either:

"(A) Sentence the defendant to imprisonment for life in the custody of the Department of Corrections as provided in ORS 163.105; or

"(B) Impanel a new sentencing jury for the purpose of conducting a new sentencing proceeding.

"(b) The new sentencing proceeding shall be governed by the provisions of subsection (1) of this section. * * *

"(c) The provisions of this section are procedural and shall apply to any defendant sentenced to death after December 6, 1984."

which may result in a further appeal occasioned by use of the pre-1989 procedures for post-1989 sentencing trials, seem to me to be insufferable.

To the special concurrence in *State v. Simonsen, supra,* which urged that the jury be told explicitly that the jury, and not the judge, is choosing between life and death when it answers the questions stated in ORS 163.150(1)(b), I would add that the jury must be told that current ORS 163.150 empowers the jury to make any of three choices — the jury alone may choose death, life imprisonment "without possibility of release or parole" *under ORS 163.105(1)(b),* or life with a possibility of parole after 20 years (provided that unanimous concurrence of the parole board is voted at a hearing held after 20 years) *under ORS 163.105(1)(c).* It seems to me inevitable that proper functioning of the jury as the sentencing authority requires that the jury be told of its options and their meaning. On remand, the jury must be instructed on its choices.

Thus, I do not support the portion of the lead opinion which discusses, with apparent *disapproval,* the trial court's giving of *any* instruction about the meaning of a life sentence in this case. 310 Or at 447-51. I believe an instruction about the life sentence options will always be relevant to inform the jury about its choices before it makes them.

However, the instruction given in this case was erroneous because it told the jury that there was a *"probability* of parole or work release," rather than a *"possibility,"* at the option of the parole board. That is not, and was not, the plain meaning of the applicable jury-sentencing statute. Telling a jury there is a *probability* of parole skews the basis for the sentencing decision in a way not contemplated by the statute. Because the case is remanded for a new penalty-phase trial before a new jury and the error is unlikely to be repeated, it requires no further consideration by this court.