Argued and submitted September 7, 1995, sentences of death are affirmed
March 8, 1996

# STATE OF OREGON,
*Respondent,*

*v.*

# JEFFREY RAY WILLIAMS,
*Appellant.*

## (CC 88CR1815; SC S40613)

912 P2d 364

John P. Daugirda, of Roost & Daugirda, Eugene, argued the cause and filed the briefs for appellant.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent. With her on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

VAN HOOMISSEN, J.

Fadeley, J., dissented and filed an opinion in which Durham, J., joined.

## VAN HOOMISSEN, J.

This case comes before us on automatic and direct review of defendant's sentences of death based on two convictions of aggravated murder. ORS 163.150(1)(g). For the reasons that follow, we affirm defendant's sentences of death.

This is the second time that this matter has come before this court. In 1991, a jury found defendant guilty of two counts of aggravated murder, both committed in 1988, and he was sentenced to death. The facts regarding the two aggravated murders of which defendant was convicted are set forth in *State v. Williams*, 313 Or 19, 828 P2d 1006, *cert den* 506 US 858 (1992) (*Williams I*), and *State v. Simonsen*, 310 Or 412, 798 P2d 241 (1990), and need not be repeated here.

In *Williams I*, this court reviewed defendant's assignments of error regarding the guilt phase of his trial and found no reversible error. *Williams I*, 313 Or at 22-42. However, in the light of *State v. Wagner*, 309 Or 5, 786 P2d 93, *cert den* 498 US 879 (1990) (concerning admissibility of mitigating evidence in penalty phase), this court vacated defendant's sentences of death and remanded the case for a new penalty phase proceeding. *Williams I*, 313 Or at 42.

In the new penalty phase proceeding in 1993, the jury answered "yes" to the four questions set forth in ORS 163.150(1)(b).[1] Thereafter, defendant again was sentenced to death on two counts of aggravated murder. He now asks this court to vacate his death sentences. Defendant makes four assignments of error, which we will consider *seriatim*.

---

[1] ORS 163.150(1)(b) provides:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

## I.

Defendant first contends that the trial court erred in prohibiting defense counsel from arguing to the jury that the court could impose two consecutive life sentences if the jury returned life sentence verdicts.[2] Defendant argues that the trial court lacked authority to limit defense counsel's argument concerning consecutive life sentences and that the court's statutory authority to impose consecutive life sentences was relevant to rebut the state's "future dangerousness" argument and relevant to the jury's determination of whether to impose a death sentence. Defendant theorizes that informing the jury of the possibility of consecutive life sentences would benefit defendant by increasing the likelihood that the jury would impose a sentence less than death.

In essence, the state argued to the jury during closing argument that defendant should receive the death penalty, because he would commit criminal acts of violence that would constitute a continuing threat to society both inside and outside prison. Defense counsel argued that defendant presented no threat to society inside prison and,

---

[2] ORS 137.123 provides in part:

"(1) A sentence imposed by the court may be made concurrent or consecutive to any other sentence which has been previously imposed or is simultaneously imposed upon the same defendant. The court may provide for consecutive sentences only in accordance with the provisions of this section. A sentence shall be deemed to be a concurrent term unless the judgment expressly provides for consecutive sentences.

"* * * * *

"(5) The court has discretion to impose consecutive terms of imprisonment for separate convictions arising out of a continuous and uninterrupted course of conduct only if the court finds:

"(a) That the criminal offense for which a consecutive sentence is contemplated was not merely an incidental violation of a separate statutory provision in the course of the commission of a more serious crime but rather was an indication of defendant's willingness to commit more than one criminal offense; or

"(b) The criminal offense for which a consecutive sentence is contemplated caused or created a risk of causing greater or qualitatively different loss, injury or harm to the victim or caused or created a risk of causing loss, injury, or harm to a different victim than was caused or threatened by the other offense or offenses committed during a continuous and uninterrupted course or conduct."

ORS 137.123 was amended in 1995 in a manner not relevant to this case. Or Laws 1995, ch 657, § 2.

therefore, that his life should be spared. Defense counsel also argued that, for all practical purposes, defendant would never be released from prison if the jury spared his life.[3] Defendant relies on the current version of ORS 163.150(1)(a),[4] Article I, section 11, of the Oregon Constitution,[5] and several provisions of the United States Constitution, including the Due Process Clause of the Fourteenth Amendment.[6]

The state argues that defendant has no statutory or constitutional right to usurp a trial court's sentencing role or to argue to a jury about the speculative possibility that he might receive consecutive life sentences if the jury returned life sentences.

In this case, two victims were murdered. At the conclusion of the state's initial penalty phase closing argument, the trial court memorialized a discussion with counsel, held earlier off the record,[7] during which the court

---

[3] Society includes prison society, as well as society at large. When the jury considers the threat that the defendant might pose because of future violent crimes, it may consider the threat to prison society. In general, therefore, the task of the jury is to consider, not *where* the defendant would be dangerous, but *whether* the defendant would be dangerous. *State v. Douglas*, 310 Or 438, 450, 800 P2d 288 (1990); *State v. Farrar*, 309 Or 132, 175-76, 786 P2d 161, *cert den* 489 US 879 (1990).

[4] ORS 163.150(1)(a) provides in part:

"The state and the defendant or the counsel of the defendant shall be permitted to present arguments for or against a sentence of death and for or against a sentence of life imprisonment with or without the possibility of release or parole."

Neither defendant nor the state argues that defendant may be sentenced to life imprisonment without the possibility of release or parole.

*Former* ORS 163.150(1)(a) (1987), the statute that was in effect at the time of defendant's crimes, provided in part:

"The state and the defendant or the counsel of the defendant shall be permitted to present arguments for or against a sentence of death."

[5] Article I, section 11, provides in part:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel[.]"

[6] The Due Process Clause of the Fourteenth Amendment provides in part:

"No State shall * * * deprive any person of life, liberty, or property, without due process of law[.]"

[7] Discussion off the record of matters as to which issues on appeal could arise is ill-advised, either because no official record is made of the matters or because whatever record that is made often is summary in nature. In this case, defendant did not complain about the off-the-record discussion.

denied defense counsels' request that they be permitted to argue that consecutive life sentences might be imposed.[8] The trial court explained:

"THE COURT: [T]here were two other things that * * * I wanted to put on the record. One was there's an instruction that I'm giving that explains what life means, the 30 years with a 20-year, and I said I was going to give that for two reasons: One, the opening statement mentioned it, and I believe [defense counsel] will be mentioning that in closing argument. But the opening statement mentioned the 30 years.

"The other thing is *State v. Douglas* [310 Or 438, 800 P2d 288 (1990)] said that generally [*sic*] shouldn't be given unless there's some evidence in the record, such as an expert who would say he wouldn't be dangerous in prison, but he would be in society. And there were several people that testified in the case that Mr. Williams was not dangerous in prison. And Dr. Wise testified that he didn't think he'd be dangerous in prison, but he should be in a structured environment, words to that effect. So I felt it was there. Based on those reasons, I'm explaining what that is.

"* * * * *

"They talked about arguing concurrent or consecutive sentences, and I said that was really up to the Court whether the sentences, if they came back with life, would be concurrent or consecutive, and I didn't think that should be gotten into because one, that's the Court's authority. In fact, the jury might view, if they found out if the defense was able to argue they'd be consecutive sentences, the State would argue there was concurrent sentences, and, frankly, that might not be the best argument in front of a jury who may not appreciate the fact that the Court would have authority to effect the sentences in such a way by making them concurrent or consecutive. But, in any event, that's within the Court's power, not within the jury's, so I didn't think it would be wise to get that [*sic*]. I did tell the defense they could certainly argue there's going to be two sentences in this case, because there are two victims.

"I wanted to add those for the record, because we had discussed those. And if anybody has any additions to that,

---

[8] Defendant was represented by two lawyers during his penalty phase trial.

they should make those now. Okay? Nobody does. We will — nobody has any additions or corrections to that * * *[.]"⁹

During his argument, defense counsel told the jury that two sentences would be imposed (either two life sentences or two death sentences), because there were two victims. Defense counsel then argued in part:

"You can infer from [defendant's positive behavioral modification while incarcerated] that Jeff Williams in jail is much less of a problem than Jeff Williams on the street. And jail is where he is going to be. A sentence in this case is either a death sentence by lethal injection, twice, I suppose, or life imprisonment. *And you heard what the life imprisonment was. It's 30 years minimum without consideration for parole, without consideration for work release, without consideration for any type of temporary leave or employment in a forestry or work camp.*

"It means inside those cold, gray walls. He'll go through that door, if you sentence him for life imprisonment, he goes through that door, he goes from here to Salem, and he's behind those walls. You drive up the freeway, you can see him from the freeway. You can see the towers and the guard over there on the west side of the freeway in Salem. It's a grim place. Any prison is a grim place. That's where he goes." (Emphasis added.)

Defense counsel further argued:

"*The two life sentences that you have in your power to give this man mean that he won't be on the streets of the State of Oregon or anywhere else.* The evidence there, the evidence you heard in the witness stand should tell you that this guy in prison has demonstrated in the last four and half years that he knows what rules are, that he can follow the rules. Maybe he does it because it's in his own best interest, but that's what prison encourages. You've got to demonstrate to people that it's in their own best interest to follow the rules so that they don't get in trouble.

---

⁹ In his reply brief, defendant states:

"A fair interpretation of the pertinent portions [of the trial court's explanation] indicates that (1) defense counsel moved to rebut the state's future dangerousness claim by proposing defense argument about the court's statutory authority to impose consecutive life sentences; (2) the state wanted to counter by arguing that the court had statutory authority to impose concurrent life sentences; and (3) the court prohibited the arguments."

The state does not challenge that interpretation.

He can do that. He's not dangerous in the setting that he's going to be in. We have to recognize reality. The State began an argument at one point by saying it's the whole picture. *But recognize reality, this guy's future is in prison. He's not a danger to the rest of us.* He's not a danger to the prison society where he'll really be.

"And on the fourth question [whether defendant should receive a death sentence], the answer to that one should be no. He's demonstrated in the last four and a half years that he has the capacity to conform himself to the rules of the institution, make some progress. We had one witness testify that he's been acting as a counselor to inmates. There may be a limited opportunity for that in his situation, but he's done it." (Emphasis added.)

After a brief rebuttal argument, during which the prosecutor did not mention the matter of consecutive or concurrent sentencing, the trial court instructed the jury:

"Life in prison means that the Court shall order the Defendant to be confined for a minimum of 30 years without possibility of parole, release on work release, or any form of temporary leave or employment at a forest or work camp. After 20 years from the date the Court imposes the 30-year minimum, the Defendant would be able to petition the State Board of Parole for an order altering his sentence to life imprisonment with the possibility of parole or work release. The Defendant would have the burden of convincing all five members of the State Board of Parole that he's likely to be rehabilitated within a reasonable period of time before a sentence could be altered."

The trial court's instruction was in accordance with *former* ORS 163.105 (1987), the statute that was in effect at the time of defendant's crimes.[10] Defendant did not request any instruction concerning the trial court's authority under ORS 137.123 to impose either concurrent or consecutive sentences and did not except to the instruction that the court gave on the possibility of parole.

Defendant relies on ORS 163.150(1)(a), 322 Or at 624 n 4. Any debate between defense counsel and the prosecutor about the sentencing alternatives available to the court under that statute would have been inappropriate here, in

---

[10] ORS 163.105 was amended in 1989 to add a third sentencing option, *i.e.*, life imprisonment without the possibility of release or parole. Or Laws 1989, ch 720, § 1.

the absence of instructions from the trial court that would have provided a legal framework within which such a debate could occur. As noted, no such instructions were requested or given in this case. In those circumstances, the trial court had the right to prevent the jury from being confused by arguments of counsel over matters that were not presented by the instructions.[11]

■■ The trial court instructed the jury that the jurors were required to accept the court's instructions regarding "what the law is on a particular subject" and that their answers to the four penalty phase questions had to be "based only on the evidence received in the case and on the instructions [the court is] now giving you." The trial court gave a reasoned and permissible explanation for its ruling. The trial court did not allow defense counsel's proposed argument about consecutive sentences, because to do so would have opened a Pandora's box involving all sorts of evidence and arguments about the possibilities of what the trial court might do,[12] what the Parole Board might do, what the Governor might do, what might happen if defendant escaped, and so forth. A trial court has the authority to prevent the parties from arguing about matters outside the record and to prevent jury confusion and speculation about matters over which the jury has no say. The trial court here did not err in declining to let defense counsel discuss the statute.

Defendant also argues that the trial court's limitation on his counsel's argument violated his rights under Article I, section 11, of the Oregon Constitution (right to be heard). Defendant, however, did not raise any state constitutional claim below and, therefore, that argument is not preserved for review. We will not consider it. *See State v. Langley*, 314 Or 247, 253, 839 P2d 692 (1992),

---

[11] Generally, the Supreme Court of the United States will defer to a State's determination as to what a jury should and should not be told about sentencing. *Simmons v. South Carolina*, 512 US ___, ___, 114 S Ct 2187, 2196, 129 L Ed 2d 133, 145 (1994), citing *California v. Ramos*, 463 US 992, 103 S Ct 3446, 77 L Ed 2d 1171 (1983).

[12] "[T]he State may also (though it need not) inform the jury of any truthful information regarding the availability of commutation, pardon, and the like." *Simmons*, 512 US at ___, 129 L Ed 2d at 151 (O'Connor, J., concurring in the judgment).

*adhered to* 318 Or 28, 861 P2d 1012 (1993) (court will not consider constitutional objections for the first time on appeal); *State v. Walton*, 311 Or 223, 240-41, 809 P2d 81 (1991) (same).[13]

Defendant next argues that the trial court's limitation on his counsel's argument violated his rights under the Sixth (right to counsel), Eighth (cruel and unusual punishment), and Fourteenth (due process) Amendments of the Constitution of the United States. Defendant, however, did not raise any federal constitutional claims below and, therefore, those arguments are not preserved for review. We will not consider them.

We hold that the trial court did not err in prohibiting defense counsel from arguing to the jury that the court could impose two consecutive life sentences if the jury returned life sentence verdicts. The court had the authority to prevent such arguments.

## II.

Defendant next contends that the trial court erred in denying his motion for a mistrial following a comment made by the prosecutor during his rebuttal argument. Defendant argues that the comment suggested that defendant had a burden of proof on the fourth question (whether defendant should receive the death penalty) and that it implied that there was a presumption that a death sentence should be imposed unless defendant met a burden of proof for a lesser sentence.

During rebuttal argument, the prosecutor told the jury:

---

[13] ORAP 5.45(2) provides:

"No matter assigned as error will be considered on appeal unless it was preserved in the lower court and assigned as error in the party's opening brief; provided that the appellate court may consider errors of law apparent on the face of the record."

*See State v. Castrejon*, 317 Or 202, 209-12, 856 P2d 616 (1993) (stating and applying rule).

ORAP 5.45(2) applies to appellate review in the Supreme Court pursuant to ORS 163.150(1)(g) (direct review of judgment of conviction and sentence of death). *See, e.g., State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990) (applying rule). No error apparent on the face of the record is presented here.

"This Defendant committed Aggravated Murder. And you look at question number four and you go down through all that evidence and you look at that and you say, does this justify a sentence less than death for his conduct? Because that's what he's being penalized for. That's the consequence is [*sic*] for his conduct. His behavior for killing those girls. And you look at those things and you say, oh, is that the evidence that I think justifies a sentence less than death for what he did? Ladies and gentlemen, you're not going to find it. *It doesn't rise to that level.* The Defendant in this case has to suffer the consequences of his behavior." (Emphasis added.)

Defendant timely objected to the prosecutor's "It doesn't rise to that level" comment.[14] The trial court sustained defendant's objection. Defense counsel did not ask the court to strike the challenged comment or to instruct the jury to disregard it. Thereafter, the prosecutor concluded his rebuttal argument, after which defense counsel told the court:

"I will have a matter for the court when we recess."

The trial court later instructed the jury as follows:

"Defendant need not prove the existence of a mitigating circumstance beyond a reasonable doubt. If you reasonably believe that mitigating circumstance exists, you may consider it as established.

"The burden of proof is on the State to prove beyond a reasonable doubt the yes answer to the first three questions submitted to you on each of the Aggravated Murders. * * *. There is no burden of proof as to the fourth question."

After the court had instructed the jury, defense counsel told the court:

---

[14] On review, defendant asserts that the prosecutor argued that defendant's mitigating evidence "didn't rise to the level["] that "justifies a sentence less than death." Although defendant's objection at trial followed the prosecutor's use of the phrases "justifies a sentence less than death" and "rise to that level," defendant's specific objection at trial was limited to the prosecutor's use at trial of the latter phrase. On review, defendant may not expand the scope of his objection at trial to make it apply to another portion of the prosecutor's argument. *See State v. Isom*, 313 Or 391, 406, 837 P2d 491 (1992) ("An objection on one ground is not sufficient to preserve some other objection"); *Wallender v. Michas*, 256 Or 587, 592, 475 P2d 72 (1970) (setting forth general rule).

> "Defendant moves for a mistrial on the basis of [the state's] argument that evidence has to rise to the level to justify a life sentence, or sentence other than death, the terminology used in the instructions. I think that's prosecutorial misconduct to suggest that Defendant has a burden of proof on that question."

The trial court found that the prosecutor's argument was "certainly within the realm of proper comment" and that, even if the comment were not proper,

> "I immediately sustained the objection. There wasn't any motion to strike, and I don't think in the context of the entire trial that the comment would do anything."

The trial court denied defendant's mistrial motion.

■■ To preserve error, a motion for a mistrial must be timely. It is timely if it is made when the allegedly objectionable statement was made. *Walton*, 311 Or at 248. Defendant's motion here was not timely and, thus, that claim of error was not preserved for review. We decline to consider defendant's argument.

### III.

■ Defendant next contends that the trial court erred in denying his motion *in limine* and in admitting evidence of his involvement in a fight with another inmate while he was in prison. He argues that the fourth question (whether the defendant should receive a death sentence) "was designed to safeguard defendant's right to a fair sentencing by assuring full presentation and jury consideration of all *mitigating evidence*" and that "[t]he state may not use it as a justification to introduce aggravating evidence." (Emphasis in original.) Defendant further argues that the state may introduce only evidence that is relevant to the first three sentencing issues. Defendant's argument misses the mark because, even if he were correct, the state's evidence *was* relevant to the issue of future dangerousness.

Before trial, defendant moved *in limine* for an order preventing the state from introducing evidence of facts concerning a fight between defendant and his cellmate. The trial court denied defendant's motion.

At trial, the state offered evidence in the form of testimony by prison guards that, in October 1989, a guard heard yelling, approached the cell that defendant shared with another inmate, and noted that it was in disarray. Both defendant and the other inmate were "breathing hard." The guard saw that the other inmate had a bite mark, a bloody lip, scratches on his neck, and a black eye. Another guard noted minor scrapes and cuts on defendant. The guards compared the injuries of the two men and determined that the other inmate had received the more serious injuries. A disciplinary hearing was held, but the charges against defendant were dismissed.

Defendant's argument misses the point that the evidence to which he objected was relevant. The trial court admitted the evidence on the ground that it was relevant to the question of defendant's "future dangerousness." We agree.

This court has held that ORS 163.150(1), which sets forth the evidence that may be considered in the penalty phase, is to be interpreted broadly, to include even unadjudicated bad acts. *See State v. Tucker*, 315 Or 321, 335, 845 P2d 904 (1993) (discussing cases). The standard of relevance in OEC 401 applies in penalty phase proceedings. *State v. Guzek*, 322 Or 245, 250, 906 P2d 272 (1995). *See* Oregon Evidence Code (OEC) 401 (relevant evidence means evidence having *any tendency* to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence); *State v. Stevens*, 319 Or 573, 580, 879 P2d 162 (1994) (standard of relevance set forth in OEC 401 applies in penalty phase proceedings); *State v. Montez*, 309 Or 564, 611-12, 789 P2d 1352 (1990) (when offered to predict future behavior, evidence of pertinent specific instances of conduct is admissible to prove a character quality, *i.e.*, future dangerousness, which ORS 163.150(1)(b)(B) makes independently relevant to penalty assessment); *State v. Moen*, 309 Or 45, 73, 786 P2d 111 (1990) (evidence of the defendant firing a gun, although remote in time and not resulting in a conviction, was relevant to question of future dangerousness); *State v. Smith*, 271 Or 294, 946, 532 P2d 9 (1975) (acquittal alone, though it

may lessen the probative value of evidence of other crime, does not render it inadmissible). *See also Dowling v. United States*, 493 US 342, 343-44, 110 S Ct 668, 107 L Ed 2d 708 (1990) (neither the Double Jeopardy Clause nor the Due Process Clause of the federal constitution barred the use of evidence relating to an alleged crime that the defendant previously had been acquitted of committing).

Defendant had the opportunity to explain or rebut the evidence of his conduct in prison. ORS 163.150(1)(c).[15] Evidence of defendant's altercation with another inmate was relevant to the question of defendant's future dangerousness. We hold that the trial court did not err in denying defendant's motion *in limine* and in admitting the challenged evidence.

## IV.

Last, defendant contends that the trial court erred in denying his motion for mistrial after a state's witness told the jury that defendant had been on death row at the state penitentiary for five years. He argues that that remark advised the jury that an earlier sentencing jury had considered his case and sentenced him to death and that the remark was extremely prejudicial and inflammatory, so as to impact negatively the jury's obligation to give full and fair consideration to the evidence. He further argues that the remark unfairly created a presumption that he should receive the death penalty and lessened the state's burden of proof on the first three statutory questions. Thus, he concludes, he was denied a fair penalty phase.

The state called as a witness a corrections officer who worked at the Coos County jail, to give evidence about defendant's actions in 1988 while he was in the Coos County jail. During cross-examination, defense counsel questioned the witness about changes in defendant's character in 1993:

"Q. You've been working [at the jail] during this trial?

---

[15] The trial court ruled that evidence of the fight could be admitted, but that defendant would be allowed to offer evidence that he was found not to have violated the institution's disciplinary rules.

"A.   Yes.

"Q.   And you've had [defendant] over there?

"A.   Yes.

"Q.   And he hasn't done anything of the sort this time?

"A.   [Defendant] and I get along just fine now.

"Q.   Do you think there's a change in his attitude toward corrections officers?

"A.   I really don't know. All I could tell you is that since [defendant] has come back — he's been back I think twice that I've seen him since he went to prison. And both of those times we've gotten along. We kid back and forth. That's all I can tell you.

"Q.   I guess you could assign two causes to that: Either he's changed his attitude or he's found out that he's got to follow the rules to get along.

"A.   *Well, I would assume that five years of state penitentiary on death row would probably change your attitude somewhat.* I don't know.

"Q.   You think —

"A.   It would certainly change mine.

"Q.   You think strict confinement has some benefits for him?

"A.   I've told [defendant] this, what I'm going to say before, and that is that I know that there's a very good person who can be loved inside of [defendant]. But I also know that there's a monster inside there. And it's hard for — I can't make a — determine as to how — what's the best course of action for [defendant].

"Q.   Would you agree that control of that monster has to come from within him?

"A.   If he's able to.

"Q.   If he's able to keep the good person on the up side, he can do okay?

"A.   I would hope so.

"I have nothing further." (Emphasis added.)

The prosecutor then commenced redirect examination of the witness:

"Q. [Corrections Officer] was this a — incident, was that considered to be a major rule violation within the facility?

"A. Yes, I believe I wrote him for disruptive behavior."

At that time, the defense counsel stated, "Judge, I have a matter for the Court." The court instructed the prosecutor to finish his redirect examination without prejudice to the matter that defense counsel wanted to raise. When the prosecutor finished, the court told defense counsel, "Make your motion." Defense counsel then moved for a mistrial, based on the witness's reference to "death row," arguing that the reference was prejudicial. The trial court denied that motion.

To preserve error, a motion for mistrial must be timely. It is timely if it is made when the allegedly objectionable statement was made. *Walton*, 311 Or at 248. Defendant's motion here was not timely and, thus, this claim of error was not preserved for review.[16] We decline to consider defendant's argument.

## CONCLUSION

We have considered all defendant's assignments of error and every argument made in support thereof. Any assignment or argument not discussed in this opinion has been considered and is found to be unpersuasive. We find no error as to the penalty phase of defendant's trial.

The sentences of death are affirmed.

**FADELEY, J.,** dissenting.

The Supreme Court of the United States held that Oregon's pre-1989 death penalty statute was constitutionally flawed. *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989); *Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989). This court (not the legislature) added 100 new words to the statute in an effort to correct its obvious defects, words that the legislative authority had not placed in the statute. *See State v.*

---

[16] Defense counsel told the trial court that his delay in seeking a mistrial was "deliberate." Counsel explained, "What was going through my head was do I make a ruckus now and emphasize it." Counsel declined the trial court's suggestion that a cautionary instruction could be given, stating "I don't want to emphasize the remark, lest it cause mischief by being emphasized."

*Moen*, 309 Or 45, 101-06, 786 P2d 111 (1990) (Fadeley, J., dissenting, detailing the 100-word addition). This court had no authority to write 100 new words into the statute.[1] ORS 174.010; Or Const, Art IV, § 1, and Art III, § 1. Therefore the statute remains, as it was, constitutionally flawed as a vehicle for imposing a sentence of death. It is that flawed statute that was in effect at the time of the 1988 criminal homicides in this case.

I would affirm defendant's convictions and the resulting lawful sentences to imprisonment for life, but dissent from imposition of a sentence of death founded on a constitutionally flawed statute.

Furthermore, the effect of the later addition of 100 new words to the statute in this case is to increase the penalty for aggravated murder after the time it was committed. The Oregon Supreme Court had previously held in *State v. Wagner*, 305 Or 115, 752 P2d 1136 (1988), that the statute, without the 100-word judicial addition, governed pre-1989 murder charges. Under the holding of the Supreme Court of the United States, there was no valid statute in 1988 for imposing the death penalty in Oregon, when defendant committed the homicides. After the homicides, this court rewrote and added to the statutory law, which, if applied here, increases the penalty from life to death and does so after the date of the crimes. That *postfactum* increase in punishment violates state and federal prohibitions against *ex post facto* criminal laws. Or Const, Art I § 21, US Const, Art I, § 10. This case should be remanded for resentencing to life imprisonment on each count, the only lawful sentences available.

Justice Durham joins in this dissenting opinion.

---

[1] Article IV, section 1, of the Oregon Constitution states in part:

"The legislative power of the state * * * is vested in a Legislative Assembly."

Article III, section 1, of the Oregon Constitution states:

"The powers of the Government shall be divided into three seperate (*sic*) departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."