Argued and submitted September 15, judgment of conviction and sentence of death affirmed December 10, 1998

# STATE OF OREGON,
## *Respondent,*

### *v.*

# CESAR FRANCESCO BARONE,
## *Appellant.*

# (CC C930577CR; SC S42014)

969 P2d 1013

David E. Groom, Public Defender, Salem, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender. Cesar Francesco Barone, *pro se*, filed a supplemental brief.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent. With her on the briefs were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Erika L. Hadlock, Assistant Attorney General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Leeson, and Riggs, Justices.*

---

* Kulongoski, J., did not participate in the consideration or decision of this case.

GILLETTE, J.

**GILLETTE, J.**

This capital case is before this court on automatic and direct review, pursuant to ORS 163.150(1)(g). Defendant seeks reversal of a judgment of conviction on four counts of aggravated murder involving a single victim. He also challenges the death sentence that was imposed on the basis of those convictions. We affirm the judgment of conviction and the sentence of death.

## I. FACTS

Shortly after 3:00 a.m. on October 9, 1992, the Washington County 9-1-1 Center dispatched a Hillsboro Police Officer to Cornell Road, on the outskirts of Hillsboro, to investigate a telephone call about shots being fired. When the officer arrived at the scene, he found an unoccupied car on the side of the road. The car was riddled with bullet holes, and there was blood on the front seat.

Within a few moments of finding the car, the Hillsboro Police received information about a "man down" on 231st Street—less than half a mile from where the car had been found. When officers arrived at the scene, they found Bryant, the car's owner, unconscious and lying in the road. Bryant had been shot in the back and in the head. She died a few hours later, without regaining consciousness.

An extensive investigation followed. Some six months later, the police concluded that defendant probably was Bryant's killer. Defendant ultimately was charged with four counts of aggravated murder: (1) intentionally killing Bryant in the course of kidnaping her, ORS 163.095(2)(d); (2) killing Bryant to conceal his identity as the kidnapper, ORS 163.095(2)(e); (3) killing Bryant in the course of an attempted rape, ORS 163.095(2)(d); and (4) killing Bryant to conceal his identity as the perpetrator of the attempted rape, ORS 163.095(2)(e).

At defendant's trial, the state's theory was that defendant intercepted Bryant, a nurse-midwife, as she drove home from work at Tuality Hospital. According to the state, defendant forced Bryant's car off the road with gunfire, injuring Bryant. Defendant then dragged the wounded Bryant out

of her car and into his own and drove with her to another location, where he attempted to rape her. Then, the state suggested, after Bryant's injuries forced defendant to abandon the rape, he shot her in the temple, execution-style, and dumped her body in the road.

A jury found defendant guilty of all four counts. After a separate penalty-phase proceeding, the same jury imposed the death penalty. Defendant challenges those verdicts and the resulting judgment in 26 assignments of error.[1] His challenges fall into three categories: 11 pertain to the *voir dire* process, 10 to the guilt phase, and five to the penalty phase of defendant's trial. We divide our discussion accordingly.

## II. *VOIR DIRE*
(Assignments 1-11)

Defendant challenges the trial court's denial of eleven separate defense motions to exclude potential jurors for cause. The motions raised primarily two types of objections: (1) that the challenged juror exhibited such extreme views in favor of the death penalty that he or she would be unable to consider mitigating evidence as required by law; and (2) that the challenged juror had independent knowledge of witnesses or events that would preclude him or her from giving fair and unbiased consideration to the evidence. As to each juror, the trial court concluded that there was insufficient evidence of actual bias and denied defendant's motions. Defendant contends that those rulings violated his right to trial by an impartial jury, as guaranteed by the Sixth Amendment to the United States Constitution and Article I, section 11, of the Oregon Constitution,[2] and his right to due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

Of the eleven *voir dire* rulings that are assigned as error, three pertain to jurors who actually served on the jury

---

[1] Defendant's court-appointed counsel raised 22 of those assignments. With this court's permission, defendant raised four additional assignments of error in a supplemental *pro se* brief.

[2] Defendant does not argue that, in this context, the Oregon constitutional guarantee differs from that of the United States Constitution.

that heard and decided defendant's case. The other challenged rulings pertain to venirepersons who did not serve on the jury, because defendant ultimately removed them through the use of peremptory challenges. The state asserts that we need not consider the second group of challenges, because the venirepersons at issue did not serve on the jury. Consequently, the state argues, any error in refusing to exclude them for cause was harmless. Defendant responds that the trial court's refusal to dismiss the eight jurors for cause was prejudicial, because it forced him to use peremptory challenges that he could have used to exclude other jurors who were objectionable to him, who did remain on the jury.[3]

It may be true that, if one or more of the eight venirepersons had been removed for cause, defendant would have used his peremptory challenges differently and, as a result, would have been tried by a jury with a different membership. However, neither the Sixth Amendment to the United States Constitution nor Article I, section 11, of the Oregon Constitution, confers on a defendant a right to exclusive control over the composition of the trial jury. Instead, the Sixth Amendment and Article I, section 11, guarantee the impartiality of the jury that sits on the case. *State v. Douglas*, 310 Or 438, 441-42, 800 P2d 288 (1990).[4]

That is not to say that peremptory challenges have no role in ensuring an impartial jury. Indeed, peremptory challenges exist for the very purpose of achieving that goal. But such challenges have no constitutional significance in and of themselves, and the fact that a defendant is forced to

---

[3] Defendant was entitled to 12 peremptory challenges. ORS 136.230(1).

[4] *Douglas* explains that position by quoting *State v. Megorden*, 49 Or 259, 263-64, 88 P 306 (1907):

"The simple question, after the peremptory challenges are exhausted is: 'Is the jury which finally tries the case impartial? If so, we cannot imagine that the accused has any just ground of complaint with regard to it. All that the constitution, all that the law, requires and demands is a trial "by an impartial jury." ' "

*Id.* at 264 (quoting *Loggins v. State*, 12 Tex App 65, 85 (1882)); *see also State v. Farrar*, 309 Or 132, 158, 786 P2d 161, *cert den* 498 US 879 (1990) (where defendant did not object to jurors who ultimately heard case, court need not decide whether a challenge for cause to a juror who later was excluded by peremptory challenge should have been allowed).

use them to achieve an impartial jury does not offend the right to a fair trial. *See Ross v. Oklahoma*, 487 US 81, 88, 108 S Ct 2273, 101 L Ed 2d 80, 90 (1988) (so holding under Sixth and Fourteenth Amendments).

■ Defendant also argues, without further explanation, that the rulings respecting the eight venirepersons who did not serve offend the Due Process Clause. Defendant does not cite authority for that suggestion and does not identify any constitutionally protected interest in life, liberty, or property that is affected by a trial court ruling on a venireperson who ultimately does not serve. In the context of defendant's argument as a whole, we understand his contention to be that, although perhaps harmless when taken individually, the challenged rulings, when viewed together and in the context of the *voir dire* proceedings as a whole, show that the trial court was engaged in an unfair pattern of denying defendant's valid "for cause" challenges. The effect of that pattern of rulings, defendant appears to argue, was to force defendant to exhaust his allotted peremptory challenges, thereby effectively skewing the jury selection process in favor of the state.

Assuming that to be defendant's argument, we find no evidence in the *voir dire* record of a pattern of decisions that could serve as a basis for a claim of a due process violation. Although the trial judge required substantial evidence of bias, or hardship, before disqualifying a potential juror for cause, and generally accepted potential jurors' assertions that they could set aside personal feelings for purposes of the trial, the judge evaluated the potential jurors evenhandedly, applying the same standard to all potential jurors. Absent any showing that the trial judge employed a double standard when considering "for cause" challenges, we find defendant's claim of procedural unfairness unpersuasive.

We conclude that any error in failing to exclude a potential juror who did not serve on the jury cannot be grounds for reversal. Therefore we do not address defendant's assignments of error respecting those potential jurors.

Three of defendant's *voir dire* challenges—those pertaining to Hinds, Toppel, and Cutler, are not of that variety. Those three persons actually served as jurors in defendant's

case. With respect to those challenges, we begin by setting out the relevant law.

■ ORCP 57 D(1)(g) governs challenges to potential jurors for cause that are based on claims of actual bias. *See* ORS 136.210(1) (so stating); *see also State v. Nefstad,* 309 Or 523, 527-28, 789 P2d 1326 (1990) (so noting). That rule provides that challenges for cause may be taken for:

> "[a]ctual bias[, which] is the existence of a state of mind on the part of a juror that satisfies the court, *in the exercise of sound discretion,* that the juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging the juror. * * * A challenge for actual bias may be taken for the cause mentioned in this paragraph, but on the trial of such challenge, although it should appear that the juror challenged has formed or expressed opinion upon the merits of the cause from what the juror may have heard or read, *such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially.*"

(Emphasis added.) In deciding whether a juror should be excluded for actual bias, the fact that he or she has preconceived ideas about a matter relevant to the case is not determinative. Rather, the test is whether the prospective juror's ideas or opinions would impair substantially his or her performance of the duties of a juror to decide the case fairly and impartially on the evidence presented in court. *State v. Montez,* 309 Or 564, 574, 789 P2d 1352 (1990) (*Montez I*); *see also Wainwright v. Witt,* 469 US 412, 424, 105 S Ct 844, 83 L Ed 2d 841, 851-52 (1985) (to the same effect).

■■ The question whether a juror is biased is one of fact, to be determined by the trial court from all the circumstances, including the challenged juror's demeanor, apparent intelligence, and candor. *Montez I,* 309 Or at 574-75. Trial court discretionary decisions on such challenges are entitled to deference and will not be disturbed except for abuse of discretion. *See Nefstad,* 309 Or at 528-29 (so holding and citing cases).

## A. Juror Hinds

█ Defendant contends that juror Hinds' views in favor of the death penalty were extreme and that she automatically would vote for the death penalty in any aggravated murder case. Defendant correctly notes that a person who automatically votes for the death penalty in cases of aggravated murder does not perform the person's duty as a juror to consider mitigating evidence. *See Morgan v. Illinois*, 504 US 719, 729-36, 112 S Ct 2222, 119 L Ed 2d 492, 502-07 (1992) (stating proposition). He points to the following *voir dire* exchange:

> "Q [Defense Attorney]: Are you of the opinion that everybody who commits that kind of aggravated murder like Ted Bundy should be put to death?

> "A [Hinds]: I believe, when you get a personality type such as Ted Bundy's, there is virtually no chance for rehabilitation. I believe, yes, they should be executed. I don't believe the American public should have to support them. They serve no constructive good for society.

> "Q: Do you understand what I mean by aggravated murder? I mean something that is intentional and aggravating factor that's done with it like in the course of committing another crime.

> "A: Yes.

> "Q: Can you think of any situation, intentional murder that has those kinds of aggravating circumstances, can you think of any situation where the death penalty is not appropriate?

> "A: Not really. * * *

> "* * * * *

> "Q: The 4th question is simply should the defendant receive a sentence of death. I want to ask it this way. If you get to this point in trial, as a juror, you would have already found a person guilty of intentional aggravated murder. You'd have already found that the person acted deliberately. Already found that there was no provocation, and you would have already found that there was a probability that that person would commit acts of violence in the future. With all that as background, is there any situation in which

you could sentence or respond no to the question should a defendant receive a sentence of death?

"A: I can't think of any.

"Q: So, in every situation where those facts were in existence, you would answer yes to that question?

"A: Yes, I would.

"Q: Would it matter to you if the defendant there had a terrible childhood, had been abused, and neglected, and mistreated?

"A: There is a lot of people who have that that don't go out and do these things.

"Q: So that would not mitigate against the death penalty, if all those other things were answered yes?

"A: No.

"Q: What about the age of the person, what if there were someone who were 18, or 19, or 55, or 60 or 65, that wouldn't matter to you either?

"A: No, it wouldn't.

"* * * * *

"Q: What if you were instructed by the judge to consider age, emotional pressure, things of that nature?

"A: I would follow what the judge would tell me to do even though I might not agree with it.

"Q: How can you follow that if you just told me that you would vote yes in every instance to that question?

"A: Well, if the court dictates that you're supposed to do something, you know, they told me I was supposed to be here today, I'm here, you know. * * *

"Q: Is it one of those situations where you consider it and then vote yes?

"A: I would probably, if the judge said we need to consider it, I would probably try to weigh the severity of it, okay? I mean, how bad was it?

"Q: What would you do with that information? You just said you can't imagine voting anything but yes to that 4th question.

"A: I know. I can't, you know. It would be extremely difficult for me because it would be something that is against everything I believe."

Defendant also highlights the following exchange:

"Q [Defense Attorney]: Part of [your] belief system is that you resent, just quoting from you questionnaire, 'resent supporting violent offenders that are of no use to society?'

"A [Hinds]: That's right.

"Q: With that as part of you belief system, how can you ever answer no to question 4?

"A: Like I said, I don't know that I could.

"Q: Given what you've just told me, what do you think about life without the possibility of parole?

"A: I've thought about that a lot, Okay. I guess in an aggravated murder case such as the definition you just gave me, I guess I ask why? * * * I mean, why should this person continue in a situation where * * * any kind of local tax dollars go on supporting that guy, you know, or gal, or whoever it may be? It makes no sense to me.

"Q: Is that another reason to vote for the death penalty in every case of intentional, aggravated murder?

"A: Yeah * * *."

The state acknowledges that juror Hinds expressed a strong *personal* bias in favor of the death penalty, but contends that the trial court's refusal to exclude her was within the bounds of its discretion. The state notes that most of the foregoing exchange involved a discussion about Hinds' personal beliefs, not about the law and how she would apply it. The state also notes that Hinds expressed a complete willingness to follow the court's instructions, even when doing so was contrary to her deeply felt beliefs.

Defendant responds that Hinds' professed willingness to follow instructions was contradicted by her other comments during *voir dire* and, as such, should be deemed insufficient to counteract the clear and inflexible bias that her *voir dire* testimony revealed. Defendant also contends that the court's refusal to exclude Hinds for cause was part of a larger

attempt to rehabilitate aggressively and unfairly jurors who, for all intents and purposes, automatically would vote for the death penalty. Defendant contends that, whether taken individually or viewed more broadly, the trial court's decision *vis-a-vis* Hinds amounted to an abuse of discretion.

Under ORCP 57 D(1)(g), actual bias does not arise out of the mere fact that the challenged juror holds certain views, but out of the fact that those views are likely to impair the juror's performance of his or her duties. Hinds' statements that she would follow the law, even when it ran counter to her own beliefs, was relevant to that inquiry. The fact that those statements may have been contradicted by other statements that she made might diminish their value to some degree. *See Lambert v. Srs. of St. Joseph*, 277 Or 223, 230-31, 560 P2d 262 (1977) (mere statement by juror that he will be fair and impartial becomes less meaningful in light of other testimony and facts that suggest probability of bias). However, it is in situations in which a potential juror's answers are contradictory or unclear that the trial court's discretion most meaningfully may come into play. The trial court has the opportunity to observe the challenged juror and may develop a sense about the juror's probable future behavior. Its observations may enable the trial court to make sense of seemingly contradictory statements. As such, even when a juror's statements that support a trial court's ruling on a challenge for bias are equivocal, there is good reason for applying our usual standard of review, *i.e.*, abuse of discretion.

Defendant suggests that *Nefstad*, 309 Or at 523, is to the contrary. We disagree. In *Nefstad*, the court concluded that a trial court did not abuse its discretion in excluding a potential juror for cause. The juror had expressed general objections to the death penalty but also had stated that he would be able to set aside that view and vote for the death penalty in appropriate circumstances. The trial court granted the state's motion to exclude the juror for cause. We affirmed that ruling, noting that the juror's statements about his ability to separate his opinions from the facts were equivocal. *Id.* at 537-38. Defendant suggests that, because juror Hinds' statements to the same effect also were equivocal, she likewise should have been excluded for cause.

.

That argument misses the point in *Nefstad*. The court affirmed the trial court in that case, not because the juror's statements were equivocal, but because the trial judge had an opportunity to observe him while he offered those equivocal responses and, therefore, to determine which of his seemingly contradictory expressions was the best reflection of the juror's true state of mind. *Ibid.* Applying that same principle here—as we must—the outcome is clear. There is evidence in the record, even when considered in light of other, contradictory evidence, to support the trial court's conclusion that Hinds could serve as a fair and impartial juror. The trial court did not abuse its discretion in denying defendant's challenge.

We already have discussed defendant's contention that a series of erroneous denials of challenges for cause skewed the composition of the jury in favor of the state. We rejected that contention in the due process context, because it was not supported by the record. We reject it here for the same reason. The trial court's repeated denials of defendant's "for cause" challenges is not, in itself, evidence of an inequitable "pattern." Absent a showing that the trial court treated the prosecution's "for cause" challenges differently, there is no basis for finding an abuse of discretion in this respect.

## B. *Juror Toppel*

Defendant contends that juror Toppel should have been excluded for cause, because he made statements during *voir dire* that revealed actual bias. Toppel stated that, in filling out the preliminary juror questionnaire, he had failed to mention that his wife had been raped when she was a teenager—a crime that he knew to be relevant to the case being tried. When questioned about how his feelings about that rape might affect his ability to try the case fairly, he denied emphatically that it would have any effect in the guilt phase. However, with respect to the penalty phase, his answer was more equivocal:

> "Q [Prosecuting Attorney]: I imagine it gets a little more difficult or a little more complicated when you get to the penalty phase in terms of assessing, you know, what he's done and so forth. But, again, are you willing to, I guess keep it in perspective of, you know, kind of take yourself out

of [—] you have had some experiences, your wife has had, and you are aware of it [—] and keep it in a perspective that you can be fair and impartial to anyone who has—it's the same type of impartiality to anyone that you believe has committed a crime of this severity. Kind of long-winded question.

"A [Toppel]: That one is harder. While I think I can sit here and say it philosophically, yes. I am not sure emotionally I can say that.

"Q: At the risk of—let me back up a step. Can you follow the court's instruct[ions] that direct you what evidence you should consider and so forth in a case like this.

"A: I think so."

Later, when asked a similar question by the defense attorney, juror Toppel again was equivocal:

"A [Toppel]: I don't know if I can answer that until the time. I can try, but I don't honestly know.

"* * * * *

"Q: Rape is a very emotional issue.

"A: Correct.

"Q: And we need people who can sort of, I mean, I know you can't guarantee anything in life, but we need people that come as close as possible, that they're not going to be overtaken by emotion and they can give us their best to be fair and impartial and not have that impeded by anything in their circumstances.

"A: I'm trying to figure out how I can help you here. Maybe a percentage would be, I don't know, 50/50, 60/40, I don't know. Mentally I believe I can do it. I just don't know."

The trial court acknowledged that Toppel was a "hard call" but, ultimately, concluded that he could serve as a juror:

"In my evaluation of his answers what he's saying is that he can't promise something because he's not been there before, but its the kind of thing that he does, for instance, he mentioned he just recently fired someone [— a] much lower level decision, but it is a decision—and he's, quite frankly, he's generally a very insightful, introspective, almost, I don't want to say sensitive, but he is. Actually I think he's a

good defense juror, quite frankly * * * And I'm going to find that it is much more likely than not that he won't be affected. And if he is, he'll be able to deal with that appropriately and still follow[ ] my instructions."

Although Toppel repeatedly acknowledged the possibility that his emotions about his wife's experiences might affect his ability to judge the case fairly and impartially, he also stated that he would try to be fair and that he believed that he could be fair. The trial judge, who watched the entire *voir dire* exchange, obviously was impressed with Toppel's thoughtful demeanor, believed that Toppel would recognize when his emotions were getting the better of him, and would "be able to deal with that appropriately." Taking Toppel's *voir dire* statements as a whole, and giving due weight to the opinion of the trial judge (who was able to observe Toppel's general demeanor), we find no abuse of discretion in the trial court's refusal to excuse juror Toppel for cause. *See Montez I*, 309 Or at 592-93 (trial court did not err in refusing to excuse for cause juror who made similar equivocal statements about ability to set aside personal feelings and degree of likelihood that he could be fair).

### C. Juror Cutler

█ Defendant contends that juror Cutler should have been removed for cause, because she had been acquainted with Coolidge, a state witness. Defendant contends that, although Cutler had denied that her past relationship with Coolidge would have any effect on her ability to judge the case fairly, that relationship inevitably would have an effect on her, because Coolidge was a "critical," "emotional" witness. Coolidge was scheduled to appear in the penalty phase to testify to the fact that defendant had broken into her home and sexually assaulted her.

The trial court found that Cutler would not be affected by her previous relationship with Coolidge. There is ample evidence in the record, other than Cutler's own statements, to support that conclusion: Coolidge had been a customer of Cutler's at a previous job, the relationship had existed in the far past, had not been renewed in the intervening 35 years, and was a business relationship, not a close friendship. The trial court did not abuse its discretion, and

therefore did not err, in denying defendant's motion to exclude juror Cutler for cause.

### III. GUILT PHASE
(Assignments 12-17, *Pro Se* Assignments 1-4)

■ Defendant first challenges the denial of his motion for a mistrial, made on the ground that the prosecutor had suggested, during examination of a witness, that defendant had been charged with multiple murders. The issue arose when the prosecutor was examining Hutcheson, defendant's former housemate, about events that had occurred in February and March of 1993, after defendant had been arrested and jailed on a matter unrelated to the Bryant murder. Hutcheson testified that, on March 5, the police had searched the house that he shared with defendant and that, in the course of the search, Hutcheson had given to the police defendant's nine-millimeter semiautomatic pistol (which had been connected to the Bryant murder by other state witnesses). Hutcheson testified that when he told defendant about the search over the telephone, defendant was angry about the pistol and that defendant called him the day after the search and told him to burn down the house:

"Q: Did [defendant] tell you why he wanted you to burn the house?

"A: Because there was something in there that could link him to a murder.

"Q: Did he say what it was that was in the house that could link him to a murder.

"A: No, he didn't.

"Q: *Did he say what murder it would link him to*?

"A: No."

(Emphasis added.) Defense counsel moved for a mistrial on the ground that the prosecutor's question, emphasized above, implied that defendant had been charged in other murders. The trial court denied the motion, concluding that, although the questions could have elicited inadmissible testimony that implied that defendant was connected with other murders, inadmissible testimony was not, in fact, given. The trial court concluded that, by itself, the question was not significant.

 The trial judge was in the best position to assess the prejudicial effect, if any, of the prosecutor's questions. We review his decision for an abuse of discretion. *See State v. Moore*, 324 Or 396, 425-26, 927 P2d 1073 (1996); *State v. Pratt*, 316 Or 561, 583, 853 P2d 827 (1993) (both applying that standard in similar circumstances). We find no abuse of discretion in this case.

It appears unlikely that the jury would derive from the prosecutor's question the implication for which defendant argues. To the uninitiated, the question would appear to ask merely whether defendant had made specific reference to the Bryant murder, not whether defendant had distinguished the Bryant murder from other murders that he may have committed.[5] Moreover, to the extent that the objectionable implication was presented, it was isolated and fleeting. In view of those facts, it was within the trial court's discretion to conclude that the questions were not damaging to defendant or, at least, not damaging enough to require a mistrial. *See, e.g., Pratt*, 316 Or at 583 (no abuse of discretion to deny mistrial based on suggestion that defendant was on death row when reference was isolated and made in passing).

 Defendant's next claim of error pertains to the state's examination of Robinson, a Hillsboro police officer assigned to investigate the Bryant murder. Defendant contends that, in the course of Robinson's testimony, the trial court permitted the prosecutor to elicit Robinson's opinion about the veracity of another witness. Defendant argues that that was reversible error, citing *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983) (improper for one witness to express opinion whether another witness is telling the truth).

---

[5] In a long exchange that preceded Hutcheson's testimony, defendant argued that Hutcheson's testimony would be inadmissible under OEC 403, because it would be offered to show that defendant had solicited Hutcheson's aid in destroying evidence of "a" murder without showing that Bryant's murder was the one defendant had in mind. The trial court knew, as did the parties, that defendant had been charged with other murders and that defendant might have had those murders in mind. Ultimately, the trial court concluded that "the state [should] be allowed to argue the inference that when [defendant] said 'a murder' he was talking about this murder, and I don't think the state has to eliminate any other murder." That exchange occurred out of the presence of the jury.

Robinson testified, among other things, that he had spoken to a jailhouse informant, Lord, about conversations between Lord and defendant that occurred while the two men were in the Washington County Jail. Robinson further testified that other police officers had interviewed Lord about the jailhouse conversations and that he (Robinson) had listened to a tape recording of the interview. The following exchange occurred during the state's redirect examination:

"Q [Prosecuting Attorney]: Now, you did not conduct the taped interview with Mr. Lord, is that correct?

"A [Robinson]: No, I did not.

"Q: And is it clear to you, in talking to Mr. Lord, in talking to the other investigators, and in reviewing the tape, that Mr. Lord was telling what [defendant] had told him?

"A: There's no doubt in my mind that, in listening to the tape and having some

"[Defense Attorney]: I'm going to object to that, Your Honor. It's a comment on the credibility of Mr. Lord.

"THE COURT: No, the question is not.

"By [Prosecuting Attorney]: (continuing)

"Q: No. Just to make it simple, was there any doubt in your mind that in terms of the source of the information, that what Mr. Lord was telling you was what he said that [defendant] had told him?

"A: Right.

"Q: And Mr. Lord was not suggesting that he was there or he personally had verified the information? He was relaying what [defendant] had told him?

"A: Right. He's telling us, to the best of his recollection, without taking extensive notes, certainly, that these are the things that [defendant] told him. And he did, I think, an excellent job in relaying as many points as he did."

Defendant contends that the trial court erred in overruling his objection. He maintains that the prosecutor's question was designed to, and in fact did, elicit inadmissible testimony, *i.e.*, a comment on Lord's credibility.

We reject defendant's contention, because the asserted error that the trial court committed in allowing Robinson's testimony was not preserved for our review. Defendant *did* object to the prosecutor's *initial* question on the ground that it asked for a comment on Lord's credibility, but the prosecutor rephrased his question. Although Robinson's response to the second question included an inappropriate comment on credibility, that comment was unresponsive to that second question. Defendant could have objected to Robinson's *comment* at that point or asked that it be stricken. He did not. Consequently, any error in permitting the jury to hear Robinson's comment was not preserved for review.

Defendant next assigns error to the trial court's decision to admit, over his objection, the testimony of Duran-Snell, a nurse-midwife who had worked with Bryant and who, like Bryant, often delivered babies at the Tuality Hospital. Duran-Snell's testimony pertained to an incident that occurred at that hospital on October 7, 1992, two days before Bryant's murder. Duran-Snell testified that she left the hospital around midnight on that date. As she walked to her car, which was parked in a lot reserved for medical personnel, she noticed a man standing outside, just beyond the hospital's locked glass doors. The man stared at her intently, which made her so uncomfortable that she decided to stay inside the building. Later, when she thought that the man had gone away, she went outside and walked to her car. Once inside it, she realized that the man still was standing on the sidewalk adjoining the lot.

Duran-Snell testified that, after leaving the parking lot, she drove along Cornell Road, using the same route that Bryant customarily used when she drove home from the hospital. Somewhere around the intersection near where Bryant's body would be found, a car with a white top came up fast behind her, briefly pulled alongside her, then dropped back behind her again, flashing its lights off and on. Duran-Snell was concerned and, when she noticed a car waiting at an intersection up ahead, pulled up next to it. The car with the white top immediately turned off in a different direction.

Duran-Snell stated that, after she learned of Bryant's murder, she reported the incident to the police. She

also testified that, when she saw defendant on the television news six months later, after his arrest in the Bryant murder, she recognized him as the man whom she had seen standing outside the hospital on October 7.

Defendant argues that Duran-Snell's testimony was not relevant to any trial issue, because a showing that, two days before Bryant's murder, he had been in the Tuality Hospital parking lot or that a white-topped car had followed Duran-Snell added nothing to the state's case. Defendant particularly notes that Duran-Snell did not and could not identify him as the driver of the white car that followed her. Defendant also argues that Duran-Snell's testimony was unfairly prejudicial, because it suggested to the jury, without any evidentiary support, that defendant had been on the Tuality Hospital premises for the purpose of stalking hospital personnel.[6]

█ Regarding the issue of relevance, our inquiry focuses on whether the testimony has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." OEC 401. Relevance is a minimal requirement: evidence is relevant even if it only slightly increases or decreases the probability that a material fact exists. *See State v. Hampton*, 317 Or 251, 255, 855 P2d 621 (1993) (stating principle).

Duran-Snell's testimony was relevant under that standard. Although Duran-Snell was not able to identify defendant as the driver of the white-topped vehicle, the timing of the reported events would support an inference that he was the driver. Moreover, her description of his behavior and his presence outside a locked hospital door, late at night, with no apparent purpose for being there, would support an inference that, two days before Bryant's murder, defendant was planning to intercept a woman as she drove home from the Tuality Hospital and that he went to the Tuality Hospital to

---

[6] Defendant also argues, on the same grounds, that the testimony of police officer Martin, who confirmed Duran-Snell's identification of defendant as the man in the parting lot, was inadmissible. Defendant's objections to Martin's testimony are identical to, and derivative of, his objections to Duran-Snell's testimony, and need not be treated separately.

find a victim. The evidence increased the likelihood that defendant had planned and prepared for his attack on Bryant, a fact that was relevant to the issue of his intent.

■ Defendant contends nonetheless that the testimony should have been excluded under OEC 403,[7] because any probative value that it had was substantially outweighed by the danger of unfair prejudice. In so arguing, defendant asserts that the testimony "unfairly" would suggest to the jury that he had killed Bryant, because he had been "stalking" a person other than Bryant two days earlier.[8]

■ Generally, evidence is *unfairly* prejudicial under OEC 403 if it appeals to the preferences of the trier of fact for reasons that are unrelated to the power of the evidence to establish a material fact. *State v. Lyons*, 324 Or 256, 280, 924 P2d 802 (1996). Although it is true that Duran-Snell's testimony was damaging to defendant, its damaging effect was based primarily on the capacity of the testimony to support a rational and material inference, *viz.*, that defendant planned a murder and, two days before Bryant's murder, was preparing for an attack like the one on Bryant. Arguably, Duran-Snell's testimony also might support an inference that *perhaps* was *not* material, such as the inference that it is more likely that defendant killed Bryant because he had been out stalking persons other than Bryant two nights before. We cannot say, however, that the trial court abused its discretion, and therefore erred, in concluding that the potential for the testimony to produce that improper inference substantially outweighed its value as evidence of planning, preparation, and intent. Admission of Duran-Snell's testimony did not violate OEC 403.

---

[7] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[8] In a related argument, defendant suggests that Duran-Snell's testimony was "other wrongs" evidence and inadmissible under OEC 404(3). However, OEC 404(3) clearly states that evidence of other wrongs is admissible to prove, among other things, intent, preparation and planning. Thus, even if it can be said to speak to other wrongs committed by defendant, the testimony would be admissible under OEC 404(3).

■ Defendant next contends that the trial court erred in admitting into evidence, over his objections, six autopsy photographs that were offered in the course of a pathologist's testimony. Defendant argues that the photographs were inadmissible under OEC 403, both because they were unfairly prejudicial (they were inflammatory and gruesome) and because they were irrelevant (the pathologist could have presented her findings without them). Defendant argues, moreover, that, because the photographs were irrelevant, the abuse of discretion standard that we ordinarily would employ in a case such as this is not appropriate.

It is true that, with respect to defendant's relevancy objection, the "abuse of discretion" standard is inapplicable. However, that principle does not help defendant here. When defendant suggests that the pathologist could have testified without the photographs, he confuses necessity with relevance. The pathologist used the photographs to illustrate her testimony. The photographs were relevant. The remaining issue, therefore, is whether the photographs were unfairly prejudicial. OEC 403.

As defendant acknowledges, we review a trial court's resolution of issues of this kind for abuse of discretion. *State v. Rose*, 311 Or 274, 291, 810 P2d 839 (1991). Applying that standard, we find no abuse of discretion here. Although the photographs in question were graphic, they could not be said to be remarkable in the context of a murder trial.

■ Defendant's next assignment of error is reminiscent of his first guilt-phase assignment of error: As in that assignment, defendant contends that the trial court erred in refusing to grant a mistrial after the prosecutor implied to the jury that defendant had been involved in other crimes. Defendant moved for a mistrial in response to the state's examination of police detective O'Connell about his contacts with Lord, the informant who had spoken to the police about his jailhouse conversations with defendant. After O'Connell briefly described the circumstances of his contacts with Lord, the prosecutor asked:

"Q: In your interviews with Mr. Lord, were your interviews limited solely to conversations that he had about the Martha Bryant case?

"A: No."

Defendant's trial attorney immediately renewed his motion for a mistrial, arguing that the prosecutor's question was a veiled attempt to convey to the jury that defendant had been implicated in other crimes. The trial court denied the motion, stating that the question "was as innocuous at it possibly could be."

Defendant argues that the trial court's ruling was an abuse of discretion. We disagree. As the trial court noted, the prosecutor's question was innocuous. That fact alone is sufficient to support the denial of defendant's motion for a mistrial.

Defendant next assigns error to the admission of testimony of a former acquaintance, Pond, to the effect that she had seen defendant with a nine-millimeter semiautomatic pistol some two or three weeks after Bryant's murder. Defendant contends that, because the testimony pertained to his possession of a pistol weeks *after* the murder, it had no relevance to any issue in this case.

We disagree. Pond's testimony about the pistol was relevant. Defendant's former wife had testified that defendant owned such a weapon before the murder. After the murder, police seized a nine-millimeter semiautomatic pistol from defendant's home. An expert testified that that pistol had fired the shots that had struck Bryant's car before her death. All that evidence pointed to defendant as the owner (and likely user) of the pistol. Pond's testimony that defendant was carrying the pistol on his person some weeks *after* the murder furthered that purpose. Pond's testimony thus was probative with respect to a material issue. The trial court did not err in overruling defendant's objection.[9]

Defendant's next assignment of error pertains to a motion for mistrial that he made on the ground that the state had failed to disclose the names and addresses of all persons whom the state intended to call as witnesses at trial. *See* ORS

---

[9] Defendant also argues that Pond's testimony about the gun was unfairly prejudicial "other wrongs" evidence, offered solely to show his propensity to possess and use firearms. He did not make that argument at trial, and we therefore do not consider it.

135.815 (stating requirement). Defendant identified three witnesses whom the state had called without providing the required notice. The trial court denied the motion, concluding that defendant had not been prejudiced by the absence of notice. Defendant argues that lack of proper notice compromised his ability properly to cross-examine the witnesses, at least two of whom, he asserts, were vital to the state's case. Defendant also appears to suggest that he was prejudiced as a matter of law by the lack of notice because "fundamental" rights of confrontation and cross-examination were offended. The state responds that defendant's claim of error was not preserved. For the reasons that follow, we agree with the state.

■　　　To preserve error, a motion for a mistrial must be made timely, *i.e*, it must be made as soon as the objectionable statement or event occurs. *See State v. Williams*, 322 Or 620; 631, 912 P2d 364, *cert den* 519 US 854, 117 S Ct 149, 136 L Ed 2d 95 (1996) (stating and illustrating proposition); *State v. Walton*, 311 Or 223, 248, 809 P2d 81 (1991) (same). In this case, defendant did not raise the state's failure to provide notice of witnesses until after the first of those three witnesses had finished testifying. Also, defendant failed to object when the other two unexpected witnesses were called and did not request a mistrial—the only motion at issue here—until after all three had testified. His motion failed to demonstrate that it was made promptly after the objectionable event occurred. At that point, the mistrial request was untimely and, consequently, did not preserve the alleged underlying error for review.

■　　　Defendant next argues that the trial court erred in permitting a police witness to comment on what defendant asserts was an invocation of his Fourth Amendment rights. Defendant points to the testimony of a police officer, White, who arrested defendant in February 1993 at a tavern in Forest Grove, on charges unrelated to the present case. White testified that, when he patted defendant down for weapons after the arrest, he discovered a key ring. White was then asked whether the key ring contained any recognizable keys:

"A:　Yes, sir. There was a Toyota key on the key ring.

"Q: And when you exited the tavern or the bar, did you note any Toyota vehicle in the parking lot?

"A: Yes, sir, there was one.

"* * * * *

"Q: Did you ask [defendant] at that time if he had a vehicle in the parking lot?

"A: It may have been prior to us actually stepping on the porch, but in that general time frame, yes, I did ask him if he had one in the parking lot.

"Q: And what was [defendant's] response?

"A: 'No,' he did not."

Defendant contends that, in light of later testimony by other witnesses indicating that the Toyota in the parking lot was defendant's and that it contained a weapon used in Bryant's murder, White's testimony implied that defendant had invoked his Fourth Amendment right to prevent White from searching his car, because he knew that the car contained evidence that would connect him to Bryant's murder. Defendant argues that the state cannot be permitted to use defendant's invocation of Fourth Amendment rights in that manner.

Although the constitutional proposition for which defendant contends is an interesting one, it is not one that we can address in this case, because it has no application to the testimony at issue. White testified that defendant untruthfully had denied ownership of a car. That testimony did not state or imply an invocation of a Fourth Amendment right.[10] We find no error.

Defendant next argues that the trial court erred in admitting the testimony of Hutcheson to the effect that defendant had ordered Hutcheson to burn down their shared residence. Defendant argues that Hutcheson's testimony cannot support an inference that defendant was attempting to destroy evidence of his involvement in Bryant's murder.

---

[10] Defendant also argues that White's comments on his claimed Fourth Amendment invocation also infringed upon his Fifth Amendment right to remain silent. That argument assumes what we already have rejected—that White's testimony described or implied defendant's invocation of a Fourth Amendment right.

That is so, he argues, because nothing in the record specifically connects the arson that he ordered to the Bryant case. Ultimately, defendant argues, because the state failed to show that he had the *Bryant* murder in mind when he ordered the arson, Hutcheson's testimony was both irrelevant, OEC 401, and unfairly prejudicial, OEC 403.[11] The state responds that Hutchinson's testimony is not rendered inadmissible by the state's failure to forge an airtight connection between the arson order and Bryant's murder. Again, we agree with the state.

As noted, evidence is relevant so long as it slightly increases or decreases the probability of the existence of a material fact. *Hampton*, 317 Or at 255. The testimony at issue here satisfies that test. When it was offered, Hutcheson already had testified that defendant had called him from jail and asked him to retrieve a nine-millimeter semiautomatic pistol (the one used in Bryant's murder) from his car.[12] Hutcheson also had testified that defendant was angry when he learned that Hutcheson had given the pistol to the police when they searched the house. In light of that testimony, Hutcheson's additional testimony that, within a day of learning that the police had his pistol, defendant ordered Hutcheson to burn down the house "because there was something in there that could link him to a murder," carried with it a strong and reasonable inference that defendant's order was motivated by the Bryant homicide. As such, Hutcheson's testimony was relevant to establish defendant's consciousness of his own guilt in Bryant's murder. Although prejudicial, the testimony was not unfairly so. The trial court did not err in overruling defendant's OEC 401 and 403 objections.

In defendant's final guilt-phase assignment of error, he challenges the trial court's refusal to strike the testimony

---

[11] Defendant also argues that the testimony was inadmissible under OEC 404(3) (subject to certain exceptions, evidence of "other crimes, wrongs, or acts" inadmissible) and that admitting it violated the federal Due Process Clause. Those objections were not made to the trial court, and we therefore do not address them. *See State v. Montez*, 324 Or 343, 356, 927 P2d 64 (1996), *cert den* 520 US 1233, 117 S Ct 1830, 137 L Ed 2d 1036 (1997) (*Montez II*) (objection to evidence on one ground does not preserve some other objection).

[12] Other testimony already had connected defendant's nine-millimeter semiautomatic pistol to the Bryant murder.

of four state experts who described and analyzed various DNA tests that had been used to link him to Bryant's murder. Defendant contends that the DNA procedures and samples described by those experts were unreliable and that the state's statistical expert conceded as much when he testified that, because of the relatively small size of the Oregon DNA database, the measure of confidence in the tests employed is only about fifty percent. Defendant also argues that the DNA testimony was misleading and scientifically unsound, because the blood samples at issue had been degraded by the passage of time and by exposure to cleaning products and because the Oregon DNA database does not account for persons of mixed race.

This court has held that DNA evidence resulting from the two kinds of tests that were performed in this case is reliable scientific evidence and, as such, generally is admissible. *See Lyons*, 324 Or at 279 (PCR-based DNA evidence is admissible under standard of *State v. Brown*, 297 Or 404, 687 P2d 751 (1984)); *State v. Futch*, 324 Or 297, 924 P2d 832 (1996) (RFLP-based DNA evidence is admissible scientific evidence). In so holding, we have acknowledged that DNA evidence, like other kinds of scientific evidence, is not necessarily infallible. However, we have concluded that, because DNA evidence relies on methods that produce *reasonably* certain results, it is admissible. *Lyons*, 324 Or at 274-75.

Defendant's arguments do not persuade us that we should depart from the foregoing view, either with respect to DNA evidence in general or the particular tests and analytical methods employed by the experts in this case. First, defendant does not persuade us that the state's DNA analysis involved an unacceptably high margin of error, because that margin was estimated at "plus or minus 50%." As the state's expert explained, where extremely small frequencies are involved, a 50 percent margin of error is inconsequential:

> "[I]f you're talking about a number in the area of 100 million, if we cut it in half to only 50 million, we're still only saying that any of these one profiles or six profiles are uncommon. It's astonishing when we see two profiles that are the same. It's astonishing."

Neither are we persuaded by defendant's concerns that degradation of DNA samples by the passage of time or exposure to cleaning fluids cast significant doubt on the results that were reported in this case. Two of the state's experts offered uncontradicted testimony that, even if such degradation or contamination had occurred, it would not produce a doubtful or erroneous match. Rather, a degraded or contaminated blood sample would be unreadable.

Finally, defendant argues that the state's use of racial categories in DNA analysis caused its results to be unreliable with respect to a person, like himself, of mixed race. That argument is not well taken. The state presented evidence about the frequency of certain DNA by racial group as *background* against which the jury could evaluate the significance of the fact that certain aspects of a blood sample matched those of a *known* person. The state's experts did not suggest that defendant belonged to any particular racial group or otherwise rely in its analysis on defendant being of a particular race.

## IV. PENALTY PHASE

Defendant first argues that the trial court erred during the penalty phase by permitting the jury to hear evidence about certain of defendant's other alleged crimes. In one challenged ruling, the trial court denied a motion to limit evidence of three separate criminal transactions that had not, for various reasons, resulted in convictions. In the other challenged ruling, the trial court overruled defendant's objections to evidence offered by the state to "prove" the facts and circumstances of the crimes underlying certain of defendant's convictions. With respect to the crimes at issue in the latter ruling, defendant had stipulated to the fact of his conviction of the crimes and had argued that any evidence about that crime that went beyond the fact of his conviction was inadmissible. On appeal, defendant contends that, although relevant to a penalty-phase issue (future dangerousness), the "other wrongs" evidence admitted by each of the foregoing rulings was inadmissible under either OEC 403 or OEC 404(2).

This court has held that a trial court may admit evidence of other wrongs, both charged and uncharged, during

the penalty phase of a capital trial. *See, e.g., Williams*, 322 Or at 632 (stating that even unajudicated bad acts and crimes are admissible in penalty-phase proceeding); *State v. Smith*, 310 Or 1, 29, 791 P2d 836 (1990) (same); *Montez I*, 309 Or at 610-12 (uncorroborated admissions to prior crimes admissible in penalty-phase proceeding). Defendant argues, however, that those cases are concerned only with the *relevance* of "other wrongs" evidence, *i.e.*, with admissibility of certain evidence under OEC 401, and do not take into account a recently enacted provision of the Oregon Evidence Code that expressly makes OEC 403 (unfair prejudice) and 404(2) (actions in given situation are in conformity with similar prior actions) applicable in penalty-phase proceedings. OEC 101(4)(d). Defendant suggests that, particularly when the misconduct at issue has not been proven beyond a reasonable doubt, or when the defendant has stipulated to the misconduct, OEC 403 and 404(2) operate to preclude admission of other wrongs evidence.

We are not persuaded. The 1995 modifications to the Oregon Evidence Code to which defendant refers do not alter the analysis in this case. Although, in other contexts, it may be "unfairly prejudicial" under OEC 403 to offer "other wrongs" evidence that has a tendency to show bad character or a propensity toward violent crime, that is not the situation in the penalty phase of a capital trial, where the defendant's future dangerousness is directly at issue. Defendant made no showing that the evidence of other crimes that was offered by the state was irrelevant to an assessment of his future dangerousness. To the extent that the state offers relevant other wrongs evidence at the penalty phase to prove the defendant's future dangerousness, and not to prove that the defendant "acted in conformity therewith on a particular occasion," OEC 404(2) is not implicated.

Nor is the challenged evidence inadmissible because it pertains to crimes that were uncharged or unproven at the time of the penalty-phase proceedings. This court has held that penalty-phase evidence may include unadjudicated bad acts committed by defendant. *Williams*, 322 Or at 632.

Finally, we reject defendant's argument that his stipulations that he had been charged with or convicted of

various other crimes precluded the state from putting on evidence about those crimes. Defendant stipulated to having been *charged with* or *convicted of* those crimes at issue, but never to actually having *committed* them. That stipulation did not limit the state's opportunity to put on evidence to show that he had *committed* them, together with the relevant details of his conduct during those events.

■ In his second penalty-phase challenge, defendant argues that the trial court erred in refusing to permit him to put on evidence showing that Bryant, his victim, was opposed strongly to the death penalty.[13] The trial court excluded all such evidence on the ground that it was not relevant to any of the statutory questions at issue in the penalty phase.[14]

Defendant argues that Bryant's opposition to the death penalty was relevant to the so-called fourth question: "Whether the defendant should receive a death sentence." In so arguing, defendant suggests that the legislature's intent in including the fourth question in ORS 163.150 was to permit the jury to consider *any* mitigating evidence, a category that, in defendant's view, includes a murder victim's opposition to the death penalty. Defendant relies on *Moore*, 324 Or at 396,

---

[13] In an offer of proof, defendant offered the testimony of Silver, who had been Bryant's longtime friend and sometime attorney, that Bryant was opposed strongly to the death penalty, that she did not believe that the state should have the power to execute anyone, that she believed that the death penalty was imposed disproportionately on people of color, that her "whole interest was in creating life and being a positive force," and that imposing the death penalty on her killer would offend her memory through its disproportionate focus on "that part of her life." Defendant also offered a tape-recorded statement by Bryant's husband, Crouch, that Crouch had made for purposes of the penalty-phase proceeding. In the statement, Crouch described Bryant's and his own anti-death penalty views and his own opinion that defendant should not be put to death.

[14] In a death-penalty proceeding, the trial court is to submit four questions to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

ORS 163.150(1)(b).

and *State v. Stevens*, 319 Or 573, 879 P2d 162 (1994), arguing that those cases show that the standard of relevance in death-penalty proceedings is so lax that "very little evidence is inadmissible, by either side." We understand defendant's argument to suggest that, no matter what its nature, any evidence is relevant to the fourth question if it might cause a juror to answer that question "no."

The inquiry in the fourth question is not so broad. ORS 163.150(1)(c)(B) (1995) provides:

"[I]n determining [the fourth question issue], the court shall instruct the jury to answer the question, 'no' if one or more of the jurors find there is any aspect of the defendant's character or background, or any circumstance of the offense, that one or more of the jurors believe would justify a sentence less than death."

This court repeatedly has held that, in order to be relevant to the fourth question, evidence must relate to some aspect of the defendant's character or background or to any circumstance of the crime. *See State v. Wright*, 323 Or 8, 16, 913 P2d 321 (1996) (stating and illustrating proposition); *Stevens*, 319 Or at 583 (same).

Defendant does not claim that the fact of Bryant's opposition to the death penalty related in any way to defendant's character or background or to any circumstance of the offense, and we find nothing in his offer of proof that would support such a claim.[15] Neither were Bryant's views relevant to any of the other penalty-phase issues that were before the jury. The trial court did not err in excluding the evidence that Bryant personally was opposed to the death penalty.

■ Defendant's next penalty-phase assignment also pertains to evidence that was excluded on the ground that it was irrelevant to any legitimate penalty-phase issue. Defendant attempted to offer the testimony of Dr. Minahan to the effect that the death penalty does not deter violent crime. The trial court excluded that testimony on the ground that

---

[15] We do not here hold that the statements and beliefs of a victim of aggravated murder with respect to a variety of subjects cannot be relevant evidence. It is conceivable that such evidence could be probative of the factors listed in ORS 163.150(1)(c)(B). The evidence of the victim's beliefs that is at issue here does not fit that description, however.

Minahan's testimony was irrelevant because it addressed only a general, political question that was not before the jury, *viz.*, whether there should be a death penalty at all. Defendant argues that Minahan's testimony would have been "helpful" to the jury, because it would have cleared up what defendant contends are common misconceptions about the deterrent value of the death penalty.

Minahan's views on the death penalty are inadmissible for the same reason that Bryant's views are inadmissible: They are not relevant to any of the four penalty-phase questions.

Defendant nevertheless argues that the testimony self-evidently is relevant to the fourth question: "What could be more relevant [to that question] than whether this defendant's death will serve the purpose of the death penalty?" That argument, like the preceding one, ignores both the wording of ORS 163.150(1)(c)(B) and this court's case law. Under both, to be relevant to the fourth question, evidence must address an aspect of the defendant's character or background or any circumstance of the offense. Because Minahan's testimony would not address those issues, it was not error to exclude it.

In his final two assignments of error, defendant argues that the trial court erred in failing to declare the death penalty unconstitutional on various grounds. Defendant concedes that the matters raised in the first of those two assignments are ones that this court has rejected in earlier cases. Although defendant does not offer that same concession with respect to the matters raised in the second of those two assignments (involving his assertion that some form of comparative sentence review, either by the jury, the trial court, or this court, is constitutionally necessary before a sentence of death can be valid), defendant's arguments essentially are equivalent to arguments that this court already has rejected in *Moore*, 324 Or at 429-34, and *State v. Cunningham*, 320 Or 47, 64-68, 880 P2d 431 (1993), *cert den* 514 US 1005, 115 S Ct 1317, 131 L Ed 2d 198 (1995). We decline defendant's invitation to revisit those issues. *See Moore*, 324

Or at 429 n 19 (declining to consider challenges to constitutionality of death penalty that had been resolved in prior cases).

The judgment of conviction and the sentence of death are affirmed.